658 F.2d 762
 16 ERC 1953, 12 Envtl. L. Rep. 20,243
 The RIVERSIDE IRRIGATION DISTRICT and Public Service Company
of Colorado, a Colorado corporation,
Plaintiffs-Appellants, Cross-Appellees,
and
Northern Colorado Water Conservancy District, Colorado Water
Congress, National Water Resources Association, Cache La
Poudre Water Users Association, Lower South Platte Water
Conservancy District, Colorado River Water Conservation
District, and Southwestern Water Conservation District,
Plaintiffs-Intervenors-Appellants, Cross-Appellees,
v.
Colonel V. D. STIPO, in his official capacity as District
Engineer of the United States Army Corp of Engineers, Omaha
District, United States Army Corps of Engineers, Don W.
Minnich, in his official capacity as Regional Director of
the United States Fish and Wildlife Service, and United
States Fish and Wildlife Service, Defendants-Appellees,
Cross-Appellants,
and
National Wildlife Federation, Defendant-Intervenor-Appellee,
Cross-Appellant.
 Nos. 80-2142, 80-2241 and 80-2242.
 United States Court of Appeals,
Tenth Circuit.
 Submitted Jan. 27, 1981.
Decided Sept. 2, 1981.
 
 James R. McCotter of Kelly, Stansfield & O'Donnell, Denver, Colo. (Timothy J. Flanagan, Denver, Colo., with him on the brief, Bryant O'Donnell, Executive Vice President and Gen. Counsel, Public Service Company of Colorado, Denver, Colo., of counsel), for plaintiffs-appellants, cross-appellees.
 Gregory J. Hobbs, Jr., Denver, Colo. (John M. Sayre, David L. Hiller of Davis, Graham & Stubbs, Denver, Colo., Kenneth Balcomb and Lawrence R. Green of Delaney & Balcomb, Glenwood Springs, Colo., Frank E. Maynes of Maynes, Bradford & Duncan, Durango, Colo., Ward H. Fischer and James Ringenberg of Fischer, Brown, Huddleson & Gunn, Fort Collins, Colo., Kirk B. Holleyman of Ireland, Stapleton & Pryor, Denver, Colo., with him on the brief), for plaintiffs- intervenors-appellants, cross-appellees Northern Colo., Water Conservancy Dist., Cache La Poudre Water Users Ass'n, Lower South Platte Water Conservancy Dist., Colo. River Water Conservation Dist., and Southwestern Water Conservation Dist.
 Michael H. Hyer of Mountain States Legal Foundation, Denver, Colo. (James G. Watt and William H. Mellor, III, Denver, Colo., with him on the brief), for plaintiffs-intervenors, appellants, cross-appellees, Colo. Water Congress and National Water Resources Ass'n.
 Anne S. Almy, Atty., Dept. of Justice, Washington, D.C. (Angus Macbeth, Acting Asst. Atty. Gen., Washington, D.C., Joseph F. Dolan, U. S. Atty., Richard A. Jost, Asst. U. S. Atty., John R. Hill, Jr., Atty., Dept. of Justice, Denver, Colo., Jacques B. Gelin, Atty., Dept. of Justice, Washington, D.C., with her on the brief), for defendants-appellees, cross-appellants.
 Robert J. Golten, Counsel, National Wildlife Federation Natural Resource Clinic, Boulder, Colo., for defendant-intervenor-appellee, cross-appellant.
 Before SETH, Chief Judge, and HOLLOWAY and McKAY, Circuit Judges.
 SETH, Chief Judge.
 
 
 1
 This is an interlocutory appeal. Riverside Irrigation District (Riverside) and the Public Service Company of Colorado (PSC) were plaintiffs below. They are involved in a joint project to construct a dam and reservoir on Wildcat Creek, a tributary of the South Platte River in Morgan County, Colorado. The reservoir is to store water Riverside is entitled to under state law, and Riverside plans to use the stored water as cooling water for PSC's nearby 500-megawatt coal-fired power plant, and for irrigation. The plaintiffs planned to proceed with the construction of the dam under a nationwide permit which allows the discharge of dredged or fill material into certain waters of the United States defined and authorized in Section 404 of the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. § 1344.
 
 
 2
 The general rule under Section 404 for anyone planning activity which will result in the discharge of dredged or fill material into waters of the United States is that they must apply for a permit from the Secretary of the Army (who acts through the Corps of Engineers) unless the Secretary has issued a general permit on a state, regional, or nationwide basis covering the planned discharge activity. More specifically a nationwide permit or authorization is one the Secretary issues covering a category of activities occurring throughout the country which involve discharges of dredged or fill material which he determines will cause only minimal adverse environmental effects when performed separately, and which will have only minimal cumulative adverse effect on the environment. See 33 U.S.C. § 1344(e)(1). A nationwide permit is automatic which means that if one qualifies for such a permit no application is needed nor must notice be given before beginning the discharge activity.
 
 
 3
 On June 6, 1978, before plaintiffs began construction of the Wildcat project, the Corps' attention was directed to the project by a Fish and Wildlife Service (FWS) employee in Denver. A Corps official contacted Riverside to discuss the project and in the conversation the official noted the potential impact of the Wildcat Reservoir on a designated critical habitat of the whooping crane, an endangered species, some 300 miles downriver.
 
 
 4
 On September 15, 1978 Colonel Stipo's predecessor as district engineer for the Omaha district sent a letter initiating formal consultation under the Endangered Species Act with the FWS regarding the Wildcat project. Finally on December 20, 1979 Donald Minnich, regional director of the FWS, sent Colonel Stipo his biological opinion which concluded that the "operation of Wildcat Reservoir is likely to jeopardize continued existence of the whooping crane and adversely modify a 53-mile reach of the Platte River which is critical habitat for the crane." Two mitigation measures were described in the biological opinion, one being the replacement of the consumptive water use by Wildcat Reservoir, and the alternative being improvement of the whooping crane's habitat along the Platte River in Nebraska.
 
 
 5
 In a letter dated February 13, 1980 Colonel Stipo notified Riverside and PSC that their proposed project does not qualify for a nationwide permit under 33 C.F.R. § 323.4-2(a)(1), unless they comply with one of the mitigation alternatives outlined by the FWS. Further, Colonel Stipo informed the plaintiffs that if they chose not to comply with either mitigation measure they would need to apply for an individual permit for their project and undergo a full public interest review. That procedure is set out in 33 C.F.R. § 325.
 
 
 6
 Riverside and PSC believe they are entitled to an automatic nationwide permit under the existing circumstances. Consequently, instead of complying with either mitigation measure, or applying for an individual permit, they filed this action in district court. The named defendants included Colonel Stipo and David Minnich in their official capacities, and their agencies. The complaint prayed for injunctive and declaratory relief, a writ of mandamus, damages, and a review of the Corps' final agency action.
 
 
 7
 The government filed a motion to dismiss for lack of jurisdiction and failure to exhaust administrative remedies. On plaintiffs' own motion the damages claim was dismissed. After briefing and oral argument the trial court granted intervention to several Colorado water groups as plaintiffs, and the National Wildlife Federation (NWF) as a defendant. The trial court further dismissed all defendants for lack of jurisdiction except Colonel Stipo in his official capacity as district director of the Corps of Engineers, and all claims were dismissed except for the requested review of the agency action.
 
 
 8
 The trial court made the necessary findings under 28 U.S.C. § 1292(b) to permit separate interlocutory appeals by defendant Stipo and defendant-intervenor NWF on the jurisdictional ruling adverse to them. Further the trial court entered judgment under 54(b) as to the counts of the complaint that were dismissed in order that plaintiffs and plaintiff-intervenors could appeal these dismissals. The federal government and NWF separately sought and were granted permission to appeal the trial court's retention of jurisdiction to review Colonel Stipo's agency action. The government's appeal is No. 80-2241 and NWF's is No. 80-2242. Plaintiffs and plaintiff-intervenors' appeal is No. 80-2142.
 
 
 9
 The basic issue on this interlocutory appeal was raised by the motion of the government in the trial court to dismiss the proceedings for lack of jurisdiction. The trial court denied the motion, but did dismiss some of the parties.
 
 
 10
 The jurisdictional motion is based on the position that the action of Colonel Stipo as to the nationwide permit is not appealable because it is not final. The government asserts that the plaintiffs must instead begin administrative proceedings by filing an application for an individual permit. Colonel Stipo's action as to plaintiffs' entitlement to come under the nationwide permit regulations was an isolated event not part of any ongoing proceedings. The situation is thus unusual in that the agency insists that proceedings be commenced to seek another type of permit before the nationwide issue can be tested.
 
 
 11
 The plaintiffs received a clear and definite decision from the agency that the plaintiffs were not entitled to a nationwide temporary permit to discharge sand and gravel during the course of construction of the dam under the nationwide permit regulations. It is clear from the record that the engineer so advised the plaintiffs of this decision or conclusion. He advised them also that they could or should do other things unrelated to the construction but pertaining to the future operation of the dam and use of water rights.
 
 
 12
 The question is thus whether the temporary construction permit issue can be tested as a separate matter and in these proceedings. It is clear that Colonel Stipo has acted as to the construction discharge permit under the nationwide regulations. The plaintiffs could test whether they have met the conditions for such a permit by commencing construction. However, the penalties are so severe that it is unrealistic to require such a test.
 
 
 13
 It is apparent that the jurisdictional issues are intermixed with those facts which go to the ultimate resolution of the case. This is however not an uncommon situation. Our treatment of the facts, regulations, and the statute is directed to the jurisdictional issue.
 
 
 14
 The basic consideration is Section 404 of the Clean Water Act (33 U.S.C. § 1344) and the regulations issued under its authority. The regulations concerned, 33 C.F.R. § 323.4-2, relate to work on the site during the course of construction of the dam, and more particularly to the placement of fill material (discharge of fill material) during construction. As indicated above, the regulations provide for automatic authority to place fill material if certain conditions are met. The regulations do not expressly provide that the Engineer is the one to decide whether the conditions are met and that automatic (nationwide) authority thereby exists. In any event, the Engineer did make such a determination. He decided and advised the plaintiffs that they did not qualify for an automatic permit. He reached a decision and officially advised the plaintiffs. His letter to the parties was as follows:
 
 
 15
 "Dear Mr. Douglas:
 
 
 16
 "Reference is made to our previous meetings and discussions regarding the Nationwide Section 404 permit for the Wildcat Creek Dam project.
 
 
 17
 "Since operation of the proposed reservoir could have an adverse impact on an endangered species (whooping crane), by letter dated 15 September 1978 my predecessor, Colonel James W. Ray, entered into consultation with the US Fish and Wildlife Service."Inclosed is a copy of the biological opinion for the project which indicates that the operation of the reservoir is likely to jeopardize continued existence of the whooping crane and adversely modify a 53-mile reach of the Platte River which is critical habitat for the crane. Accordingly, construction of the proposed dam does not qualify for 'Nationwide' authorization within the meaning of 33 C.F.R. 323.4-2(a)(1) unless you exercise one of the two alternatives outlined in the biological opinion.
 
 
 18
 "Should you elect to proceed with construction of the dam, an individual permit processed through the full public interest review will be required."
 
 
 19
 The "conditions" referred to in the above letter were contained in a letter to Colonel Stipo from the Regional Director of the Fish and Wildlife Service, Mr. Minnich. This letter, in part, said:
 
 
 20
 "It is our biological opinion that operation of Wildcat Reservoir is likely to jeopardize continued existence of the whooping crane and adversely modify a 53-mile reach of the Platte River which is critical habitat for the crane.
 
 
 21
 ....
 
 
 22
 "This critical habitat for the whooping crane lies between Lexington and Shelton, Nebraska, approximately 260 miles downriver from the proposed reservoir. The additional adverse modification of the critical habitat would be significant because this habitat already is seriously impacted by removal of water from the river system. Numerous water development projects exist within the Platte River Basin and more are planned....
 
 
 23
 "... Implementation of either of the following alternatives for the Wildcat Reservoir would preclude jeopardy to the whooping crane and adverse modification of the crane's critical habitat.
 
 
 24
 "The first alternative is for the Corps to condition the Section 404 permit to require replacement of the additional consumptive use due to the Wildcat Reservoir. Replacement must be done in a manner that closely approximates the flow that would occur if the reservoir were not constructed. It would be beneficial if the applicant were to obtain and release this water from a source closer to the critical habitat than the Wildcat Reservoir, thereby making the water less vulnerable to diversion upstream from this habitat; however, this would be left to the applicant's discretion. The volume to be released might be reduced and the timing altered after conclusion of Department of Interior studies of the Platte River system....
 
 
 25
 "The second alternative is for the Corps to require the applicant to improve or maintain whooping crane habitat along the Platte River. This alternative probably would include water releases (of a lesser volume than the reservoir would deplete) combined with land acquisition and habitat manipulation and management. Examples of habitat practices include clearing and leveling of islands, burning or spraying of vegetation, and flow regulation designed to increase scouring.
 
 
 26
 "The Audobon Society has experimented with ways to improve whooping crane habitat on the Lillian Annette Rowe Sanctuary within the area of critical habitat. Thus far, clearing and leveling of islands seem to be a relatively effective technique for setting back plant succession and maintaining it in an early stage. Vegetation is cleared mechanically; then the island is leveled to near base flow by a caterpillar tractor. Roots of trees and shrubs are removed so sprouting and suckering are reduced. Natural scouring by water is increased because the lowered island is more easily flooded. The above combined with flow maintenance, should be quite effective. Details of a management program cannot be developed until after completion of the Department of Interior Platte River studies. Any management program should be developed in consultation with the FWS."
 
 
 27
 Referring again to the Engineer's letter quoted in full above, it must be significant that no mention was made of the placement of fill material during construction although this was the basic question. He did not indicate that the conditions of the automatic authorization were not met. It should be thus assumed, considering the fact that the fulfillment of one of the conditions would qualify the plaintiffs, that the automatic authorization requirements in the regulation were met. Again, the letter concerned only the operation of the dam and the water flow at the crane habitat some 250 to 300 miles downstream.
 
 
 28
 The Engineer's concern, he stated, could be removed by water releases to Nebraska from the dam or by money to perform work on the ground at the location of the habitat in Nebraska, or by both. Again, it must be assumed that he had concluded that no problems would arise during construction.
 
 
 29
 There is no question raised as to the validity of the Colorado water rights held by the plaintiffs. The construction of the dam, the impoundment, and the planned release of water were proper under state law. The only federal "permit" expressly required was the authority for fill placement during construction. No one in these proceedings asserts that the construction work on the dam nor the placement of fill material will in any way affect the crane habitat.
 
 
 30
 The "biological report," quoted in part above, is also directed only to the operation of the dam, thus "It is our biological opinion that operation of Wildcat Reservoir ...." The conditions described also relate to the dam operation, the use of plaintiffs' water rights, to money, to the islands at the habitat, and the hope that plaintiffs would buy water rights downstream near the habitat.
 
 
 31
 We must conclude that the decision by the Engineer, when accompanied by the conditions as it was, is reviewable as the trial court decided. We have considered in reaching this conclusion the admonitions in Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681; the opinions in Gardner v. Toilet Goods Assn., 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704; In Re Grand Jury, April 1979, 604 F.2d 69 (10th Cir.); Norvell v. Sangre de Cristo Development Co., Inc., 519 F.2d 370 (10th Cir.); and Martinez v. Richardson, 472 F.2d 1121 (10th Cir.). The Engineer has clearly decided that plaintiffs were not qualified for a nationwide permit. As we have mentioned, perhaps he did not need to so decide but he did so and officially advised the plaintiffs and thereby stopped construction of the dam. His reasons, as further demonstrated by the position taken in this court, show that the question is a legal one. It is clearly the authority of the Engineer over water quantities. Further factual development is not necessary or useful. He expressed a final position on the automatic permit, and at the same time demonstrated that such authority was a matter separate and apart from applications for other types of permits.
 
 
 32
 The defendants argue that plaintiffs could proceed with construction and test the validity of the Engineer's position by incurring the civil and criminal penalties. It is apparent however that this is an unrealistic position. The penalties were made so severe that they foreclose a testing of authority by proceeding with the work. Again, this is completely unrealistic as a remedy in view of the position expressed by the Engineer. Thus his act effectively has prevented construction to this day. For all practical purposes they were required to so stop by his act. Bethlehem Steel v. E. P. A., 536 F.2d 156 (7th Cir.); Pepsico v. F. T. C., 472 F.2d 179 (2d Cir.). The ending of construction was the direct impact of the decision and the injury thereby caused has continued. The issue is here. It is not speculative or remote. Natural Resources Defense Council v. U. S. Nuclear Regulatory Commission, 539 F.2d 824 (2d Cir.). There were no ongoing proceedings. The Engineer initiated the dispute by his earlier correspondence and discussions. This culminated in the decision in issue and that was the end of that. Nothing else has been started and the official action is final on the point. There would seem to be no need for the plaintiffs to start something else and something different. The right sought was clearly denied. Chicago & Southern Air Lines v. Waterman Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568.
 
 
 33
 The Engineer made no determination, and the "cure" by the conditions indicates nothing whereby the placement of fill would destroy or endanger the habitat of an endangered species (33 C.F.R. § 323.4(b)(1)), nor that the placement would in any way affect the "aquatic environment." (See Guidelines, 40 C.F.R. § 230.) Thus again the issue is reduced to the Engineer's statutory authority to control of the quantity of water released. Thus there is for all practical purposes nothing else.
 
 
 34
 This issue is a legal issue and it simply is whether the Engineer has exceeded his statutory authority. This is abundantly clear from the arguments and briefs in this court. The Wallop Amendment (Sec. 101(g)) has been argued (with similar provisions in other statutes), as have the statute ratifying the South Platte Compact (44 Stat. 195), the scope of the Clean Water Act, and the several cases considering state water rights. The issue is clearly down to a matter of the Engineer's authority. See Oestereich v. Selective Service Bd., 393 U.S. 233, 89 S.Ct. 414, 21 L.Ed.2d 402 and Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210.
 
 
 35
 In summary, it must again be noted that no one asserts that the placement of fill material during construction would have anything to do with the crane habitat. The Engineer's reason for refusal was based solely on his view that he can control the quantity of water released from the dam. Such were his conditions. He thus decided what it would take to get a permit. There was no endangered species connection arising from construction as such.
 
 
 36
 The government on this appeal insists that the Engineer can and should control the quantity of water released. The plaintiffs insist just as stoutly that the Engineer cannot so control water quantities for to do so is to interfere with their water rights acquired under state law and with the Interstate Compact. No more facts are needed. The dispute is one of law, of the authority of the Engineer, and compliance with the regulations. The issue is closely drawn. The Engineer has acted. He has given a final decision on the automatic permit.
 
 
 37
 Again, the Engineer has indicated clearly what is needed to get a permit. There is no requirement that plaintiffs should apply for something else and begin some other administrative action before the legal issues are here resolved. This is a separate matter, final action has been taken, and it is suitable for resolution in these proceedings. No other adequate remedy exists.
 
 
 38
 Thus the decision by the Engineer was reviewable in the manner as decided by the trial judge. The case is remanded to the trial court for a determination whether the Engineer acted within his authority and to resolve whatever other issues may remain.
 
 
 39
 We have examined the several other issues raised by the parties but no discussion is necessary. The appeal of the plaintiffs as to the dismissal of the parties does not contain issues which need be considered separately from the basic issue discussed above, and the trial court is affirmed as to the dismissal of the several parties and the denial of relief by way of mandamus or injunction.
 
 
 40
 IT IS SO ORDERED.