The **HUDSON RIVER DEFENSE LEAGUE; the Hudson River Fishermen's Association; Rockland County Conservation Association, Inc.; Michael Elliot; Constance P. Voss; Lloyd A. Hamilton; Kenneth M. Morris; and Virginia B. Morris, Plaintiffs,**

v.

**CORPS OF ENGINEERS, UNITED STATES ARMY; Colonel Fletcher H. Griffis as District Engineer, New York District, Corps of Engineers, United States Army; Eberhard Thiermann; and Ingrid Thiermann, Defendants.**

No. 86 Civ. 3788 (EW).

United States District Court,
S.D. New York.

June 11, 1987.

Sive, Paget & Riesel, P.C., New York City, for plaintiffs; David Sive, of counsel.

Rudolph Giuliani, U.S. Atty., for S.D. N.Y., New York City, for Federal defendants; Amy Rothstein, Asst. U.S. Atty., of counsel.

Waters, McPherson, McNeil, P.A., Seacaucus, N.J., for defendants Eberhard Thiermann and Ingrid Thiermann; Daniel E. Horgan, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Defendants Eberhard and Ingrid Thiermann own a parcel of land on the bank of the Hudson River in the town of Grand View-on-Hudson, New York. Since the early 1970's, they have sought permits from defendant United States Army Corps of Engineers (the Corps) that would authorize them to place fill in the river to enlarge their property or protect it from erosion and thereby enable them to build a home. The result has been over a decade of litigation between the Thiermanns and a group of neighbors and environmentalists who oppose placing fill in the river.

The instant suit stems from the Corps' decision in April 1986 to issue the Thiermanns a permit authorizing them to place "riprap"—large pieces of rock—at the mean high water line along their property to protect it from erosion. The Corps' action was taken pursuant to § 404 of the Clean Water Act, 33 U.S.C. § 1344, and § 10 of the Rivers and Harbors Appropria-

tions Act of 1899, 33 U.S.C. § 403. Plaintiffs, three local environmental groups and three individuals, commenced this action to obtain an order declaring the permit invalid and permanently enjoining the Thiermanns from further activity under the permit. Plaintiffs' motion for a preliminary injunction was denied on the ground that the riprap would not be harmful or that any harm it might cause would not be irreparable. The government defendants, joined by the Thiermanns, move pursuant to Fed.R. Civ.P. 56(b) for an order granting them summary judgment and upholding the permit. Mindful of the principles that govern the granting of motions under the summary judgment rule, the Court is persuaded that the defendants are entitled to such relief.

## I. History of the Litigation

Plaintiffs argue for invalidation of the riprap permit in part because of alleged illegal filling of the river prior to its issuance. A brief history of the property and the parties' dispute is thus in order. The Thiermanns bought the property in 1970, and under a permit issued by the Corps on October 29, 1973, began adding fill to the river to extend their property enough to meet the lot size required for a house. Neighbors and environmentalists commenced an action challenging the permit and obtained a temporary restraining order against further filling on May 22, 1974, and a preliminary injunction was granted by Judge Charles Stewart on July 3, 1974.[1] On July 16, 1974, the Court declared the permit invalid because it had been issued without a public hearing.[2]

Since that time, additional fill has fallen into the river, as indicated by the waterward movement of the mean high water line (MHWL) on the Thiermanns' property. The location of the MHWL has been recorded in three different surveys, indicating three different lines: the Boswell line, which shows the location of the MHWL as of 1967, the Youngblood line, which shows the MHWL in 1982, and the Avener line, which shows the MHWL as of 1985.[3] The Avener line was verified as accurate by the Corps as of September 18, 1985.[4]

According to the Corps and the Thiermanns, the change from the Boswell to the Youngblood line was due to filling by the Thiermanns pursuant to, and prior to the invalidation of, the 1973 permit. The Thiermanns were never asked to remove the fill. As regards the change from the Youngblood to the Avener line, the Corps and the Thiermanns state that it resulted from a violent storm that occurred on March 28–29, 1984.[5] Plaintiffs argue that the Corps' reasoning as to how these lines developed is arbitrary and capricious and that the movement of the MHWL was caused by illegal filling by the Thiermanns.

The Thiermanns filed an application with the Corps on May 17, 1985, seeking permission for the construction of "140 feet of concrete bulkhead and placement of approximately 180 cubic yards of material over 2300 square feet of intertidal area."[6] The Corps issued on August 17, 1985, a notice of public hearing identifying the proposal as the Thiermanns' project, and held the hearing on September 18, 1985. On April 26, 1986, the Corps issued its Record of Decision which rejected the Thiermanns' proposal and instead authorized a project

1. *River Defense Committee v. Thierman,* 380 F.Supp. 91 (S.D.N.Y.1974).

2. *River Defense Committee v. Thiermann,* 74 Civ. 159 (CES) (S.D.N.Y. July 16, 1974), Administrative Record (AR) at 1471.

3. All three lines are inscribed on a map in the administrative record at 477.

4. Environmental Assessment for Application No. 85–404–YS, by Eberhard and Ingrid Thiermann, at 1, AR at 23 (hereinafter Environmental Assessment). Although plaintiffs question

what date the Avener Survey was performed, nothing in the Corps' analysis turns on the correct date, since the Corps verified the survey as of September 18, 1985.

5. Section 404(b)(1) of the Clean Water Act Guidelines Evaluation for Application Number 85–404–YS by Eberhard and Ingrid Thiermann, at 2–3, AR at 27–28 (hereinafter Clean Water Act Guidelines Evaluation).

6. Statement of Findings for Application No. 85–404–YS by Eberhard and Ingrid Thiermann at 1, AR at 17 (hereinafter Statement of Findings).

of smaller scale: the placement of "approximately 142 linear feet of riprap stabilization along the existing mean high water line" on their property.[7] Although the Thiermanns' original proposal to install a bulkhead was opposed by all reviewing federal and state agencies but one, all agencies were in accord that installation of riprap to prevent erosion would be acceptable.[8] The riprap proposal, suggested by the Corps, was approved on the condition that it be executed in compliance with the Corps' "Nationwide Permit" for bank stabilization, 33 C.F.R. § 330.5(a)(15), and the conditions and management practices for nationwide permits, 33 C.F.R. §§ 330.5(b) and 330.6.[9]

Nationwide permits, in contrast to individual permits, are promulgated by the Corps for activities that can be authorized generally and do not require approval on a case-by-case basis.[10] If one qualifies for such a permit, no application to the Corps is necessary, nor need notice be given before beginning the permitted activity.[11] The conditions for "bank stabilization" activity, as authorized by 33 C.F.R. § 330.5(a)(15), are that the installation must be "necessary for erosion protection," be "less that 500 feet in length," and be limited to "less than an average of one cubic yard per running foot placed along the bank within waters of the United States." No fill may be used "in excess of the amount needed for erosion protection," the fill may not "impair surface water flow into or out of any wetland area," and only "clean" material may be used as fill. Apart from certain management practices set forth at 33

C.F.R. §§ 330.5(b) & 330.6, these are the only requirements in order for a bank stabilization project to qualify under the nationwide permit.

In sum, when the Thiermanns applied in May 1985 for a permit to construct a concrete bulkhead, the Corps processed the application as submitted for an individual permit. That process entailed an environmental assessment, an assessment under the Clean Water Act guidelines, notice and comment, and a public hearing. Ultimately, however, the Corps rejected the Thiermanns' proposed project,[12] and instead issued a permit for the installation of riprap for stabilization purposes.

## II. Discussion

Plaintiffs have not challenged the Corps' conclusion that the riprap project falls within the nationwide permit for bank stabilization. Instead, they argue that the Thiermanns' permit is invalid because: (1) the Corps has irrationally dismissed the contention that the existing MHWL is the result of illegal fill[13]; (2) the Corps has failed to consider relevant factors and alternatives in issuing the riprap permit[14]; and (3) the Corps gave inadequate public notice of the hearing on the permit.[15] Each of these arguments is discussed below.

■ A. Scope of Review.—Judicial review of agency action is with few exceptions limited to a review of the administrative record.[16] This rule is applied to review of Corps decisions to grant or deny individ-

7. Id.

8. Id. at 4–5, AR at 20–21.

9. Id. at 5–6, AR at 21–22.

10. Compare 33 C.F.R. § 323.2(m) (defining individual permits) with 33 C.F.R. § 323.2(n) (defining nationwide permits).

11. 33 C.F.R. § 330.5, 330.7; National Wildlife Federation v. Marsh, 721 F.2d 767, 772–73 & n. 7 (11th Cir.1983); Riverside Irrigation Dist. v. Stipo, 658 F.2d 762, 764 (10th Cir.1981).

12. The Corps found that the Thiermanns' proposal did not comply with section 404(b)(1) of

the Clean Water Act. Clean Water Act Guidelines Evaluation at 6, AR at 31.

13. Amended Complaint at para. 33(f). Paragraphs 33(a), (d) & (g) of the complaint contain allegations that assume illegal fill is present on the Thiermanns' property.

14. Amended Complaint at para. 33(b), (c).

15. Amended Complaint at para. 33(e).

16. Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743–44, 105 S.Ct. 1598, 1607–08, 84 L.Ed.2d 64 (1985); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

ual fill permits.[17] The administrative record upon which the Corps acted consists of 1800 pages, including photographs, maps, and records of the Thiermanns' previous permit applications, dating back to 1971. In light of this extensive record, and the Corps' documents explaining its decision on the 1986 permit, plaintiffs cannot claim that the record is so sparse as to make judicial review ineffectual.[18] Although plaintiffs on their motion for preliminary injunctive relief sought to depose Corps officials in order to determine their reasoning in granting the permit, no showing was made of bad faith or other extraordinary circumstances that might justify probing the minds of agency decisionmakers.[19] Accordingly, plaintiffs' motion to depose agency officials was denied, and this Court's review is confined on this motion for summary judgment to the substantial administrative record.

The standard for review of the Corps' decision to issue the riprap permit is set forth in the Administrative Procedure Act, at 5 U.S.C. § 706(2)(A), which provides that informal adjudicative actions will be set aside if found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."[20] As our Court of Appeals stated in *Sierra Club v. United States Army Corps of Engineers,*

> [A]n agency's action is held to be arbitrary and capricious when it relies on factors Congress did not want considered, or utterly fails to analyze an important aspect of the problem, or offers an explanation contrary to the evidence before it, or its explanation—as is apt here—is so implausible that it cannot

be ascribed to differing views or agency expertise.... While a reviewing court may not supply the basis for the agency's decision—lest it interfere with matters entrusted to the executive branch—it will uphold a decision of less than ideal clarity if the "path [the agency] followed" can be discerned.[21]

This Court's review is thus limited to determining, on the basis of the administrative record, whether the Corps' decision is rational—the result of reasoned decisionmaking. The Corps' decision may not be reversed simply because those who oppose it, or even this Court, believe it is wrong.[22]

**B. Allegations of Illegal Filling.** —As noted, plaintiffs argue that the Corps failed to consider whether the existing MHWL was the result of illegal filling by the Thiermanns. In fact, however, the administrative record demonstrates that the Corps did consider such allegations and concluded there is no illegal fill present on the property.[23] Implicitly recognizing that the Corps did consider the claims of illegal filling, plaintiffs also argue that the Corps' conclusions on the subject were irrational. In particular, they allege that the Corps was irrational in concluding that: (1) the Avener line resulted from the storm on March 28–29, 1984; (2) the Thiermanns' illegal filling of the river terminated when the Corps' 1973 permit was declared null and void; and (3) the Youngblood line was created by filling prior to the invalidation of the 1973 permit.[24]

As noted above, this Court's role is not to choose between competing analyses, but simply to determine whether the Corps'

---

17. *Friends of the Earth v. Hintz,* 800 F.2d 822, 829 (9th Cir.1986); *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 905 (5th Cir.1983).

18. *Sierra Club v. United States Army Corps of Engineers,* 772 F.2d 1043, 1052 (2d Cir.1985).

19. *United States v. Morgan,* 313 U.S. 409, 422, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941); *Yaretsky v. Blum,* 629 F.2d 817, 823 (2d Cir.1980), *rev'd on other grounds,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *National Nutritional Foods Assoc. v. Mathews,* 557 F.2d 325, 332–33 (2d Cir.1977).

20. *Friends of the Earth v. Hintz,* 800 F.2d 822, 831 (9th Cir.1986); *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 904 (5th Cir.1983); *Nofelco Realty Corp. v. United States,* 521 F.Supp. 458, 462 (S.D.N.Y.1981).

21. 772 F.2d 1043, 1051 (2d Cir.1985).

22. *Id.; Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

23. Statement of Findings at 3; AR at 19.

24. Amended Complaint at para. 33(f).

decision is rational. It is evident from the Corps' discussion of these issues that its conclusion rests upon a rational basis: it reviewed the location of the MHWL as documented in the available surveys of the Thiermann property and it reviewed all available photographs of the shoreline dating back to 1971.[25] Although plaintiffs allege that the Corps' reasoning ignores evidence of illegal filling, and that the hypothesis that a storm filled in the river is irrational, a review of the administrative record leaves no doubt that the Corps' conclusions are the product of reasoned analysis and are amply supported by the record.

First, plaintiffs challenge the Corps' acceptance of the Youngblood line as an accurate reflection of the MHWL that resulted from filling of the river under the 1973 permit before it was invalidated. The Youngblood Survey, conducted in 1982, has been relied upon by the Village of Grand View-on-Hudson as setting a benchmark in disputes over illegal fill.[26] The conclusion that the Youngblood line also represents the MHWL at the time the 1973 permit was invalidated also follows from the fact that the administrative record contains no evidence of filling between the date of the invalidation and the date of the Youngblood survey. In the absence of such evidence, there was no reason for the Corps to conclude that the Youngblood line was the result of illegal filling.[27]

The remaining issue is whether the Avener line was created by illegal filling after the Youngblood survey. The Corps notes that although there was documented evidence of illegal filling during repairs to

a pier in August 1983, village officials monitored the repairs and reported to the Corps that as of August 24, 1983, all fill had been removed back to the Youngblood line.[28] The Corps further noted, based upon an aerial photograph of the property taken on April 9, 1984, that the MHWL on that date matched the Avener line, indicating there had been no filling after that date.[29] The creation of the Avener line thus must have taken place between August 24, 1983 and April 9, 1984. Based on the administrative record, which included extensive testimony from Thiermanns' neighbors as to the alleged illegal filling, the Corps found no evidence of illegal filling during this period.[30] What did occur in this period, however, was the storm of March 28–29, 1984. Given the evidence that the river bank in the Thiermanns' area was prone to erosion, it was rational for the Corps to conclude that the Avener line was the product of upland erosion induced by the storm. It was on the basis of well-documented evidence that the Corps determined that the Avener line was the product of natural phenomena rather than illegal fill.

Plaintiffs assert that the storm hypotheses is irrational given that the Avener line consists of rock upon rock and that the position of rocks upland on the Thiermann property would have made it difficult for them to roll into the river. These arguments, however, fail to establish irrationality, given that erosion could change the topography of the property, and that rocks, having rolled off a river bank, might come to rest on top of each other. Plaintiffs also

---

25. Statement of Findings at 3, AR at 19.

26. *See* Stop Work Order of August 23, 1983, AR at 549.

27. Assuming arguendo that there was no rational basis for this conclusion, the plaintiffs would be estopped from raising this objection for failure to have raised it at the administrative level. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 554–55, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978).

28. Guidelines Evaluation at 2, AR at 27; Memoranda of Conversations with Village Officials, AR at 543–44; Stop Work Order of August 23, 1983, AR at 549.

Plaintiffs, arguing that illegal fill existed before the storm of March 28–29, 1984, have cited the letter from John Zammit of the Corps to the Thiermanns concerning a 1983 photograph that showed fill not present in earlier photos. AR at 562–64. Plaintiffs have ignored, however, the reply explaining that the photograph depicts fill removed as of August 24, 1983. AR at 546–47.

29. *See* Statement of Findings at 2–3, AR at 27–28; Memo for the Record by Peter Tischbein, March 21, 1986 and attachments, AR at 230–32.

30. Transcript of March 12, 1986 hearing before the Hon. Charles E. Stewart, D.J., AR at 46–228.

point to statements by Eberhard Thiermann and his attorney that appear to contradict the storm hypothesis. They note that the Thiermanns' attorney stated that the impact of the storm did not require amendment of the permit application, and they assert that Eberhard Thiermann "skillfully avoided" expressing a view at the contempt hearing as to the amount of fill moved by the storm. Yet whatever inferences plaintiffs would draw from these statements, none compel the conclusion that the Corps' reasoning was illogical, since the Corps' analysis relied upon photographic evidence and surveys of the Thiermanns' property, rather than statements by the Thiermanns or their attorney.

Plaintiffs also allege that the Corps has not made the "necessary" finding that the fill placed pursuant to the 1973 permit and prior to its invalidation is legal, and that the Corps has failed to assess the environmental impact of that fill. The administrative record, however, indicates that the Corps has chosen to allow the pre–1974 filling to remain,[31] and that it did consider the desirability of removing past fill and was advised against such removal by other reviewing agencies.[32] Given that no regulations require a declaration that past fill is "legal" before additional fill may be permitted, and given that the Corps has considered the environmental impact of the fill, no abuse of discretion has been committed in this regard.

■ *C. Consideration of Factors and Alternatives.*—Plaintiffs allege that in granting the April 1986 permit, the Corps failed to consider as relevant factors: (1) the Thiermanns' alleged unlawful filling of the river over the previous 12 years; (2) the full administrative record of the application for the 1986 permit, including the adminis-

trative records of all prior applications of the Thiermanns and the record of the 1974 action before this Court; (3) the public interest in securing obedience to the laws of the United States and to judgments of United States Courts; and (4) the precedent established by rewarding flagrant and repeated violations of such laws and judgments.[33]

Plaintiffs' allegation that the Corps failed to consider these factors is completely unwarranted, given the Corps' analysis discussed above. As the Corps noted in its Statement of Findings of Fact on the Thiermanns' application:

> The means by which existing fill entered the River has been the subject of considerable discussion by local residents during the application process. Although this office has no evidence to show that the applicant currently has illegal fill on their [sic] property, however, many citizens of Grand View-on Hudson believe that this is the case and believe that it is a viable reason for permit denial. All available pictures and testimony produced since filling was proposed in 1971 have been examined.[34]

Simply put, the Corp. has considered all available evidence since 1971, identified the issue raised by plaintiffs in its statement of findings, and concluded that there was no illegal fill on the property.

Plaintiffs further allege that the Corps did not "duly and adequately consider alternatives to the action authorized by the 1986 Permit," including the alternative of no action, the alternative of requiring the Thiermanns to restore the area of the river they had unlawfully filled, and the alternative of constructing a residence elsewhere on the Thiermann parcel.[35] This argument,

**31.** *See* Clean Water Act Guidelines Evaluation at 3, AR at 28 ("[B]ecause there was no determination by the Corps that the public interest required removal of the fill, the Thiermanns were not directed to remove this fill.").

**32.** Statement of Findings at 4, AR at 20 ("[The National Marine Fisheries Service] commented that removal of existing fill was not necessary in light of potential fishery or water quality impacts."); Minutes of Interagency Meeting to Discuss Eberhard Thiermann, Case No. 85–068, AR

at 553 (Environmental Protection Agency and New York Fish & Wildlife Service agree that they did not see need for removal in light of "potential fishery or water quality impacts.").

**33.** Amended Complaint at para. 33(a).

**34.** Statement of Findings at 3, AR at 19.

**35.** Amended Complaint at para. 33(c).

however, is contradicted by the administrative record. The Corps' Clean Water Act Guidelines Evaluation explicitly discussed the alternatives of no fill and relocation of the house.[36] The assertion that the riprap permit was never considered as an alternative to the Thiermanns' proposal is clearly without merit, given that the riprap was the project ultimately authorized. Finally, the advisability of removing fill was considered by the Corps, as noted above.

**D. Procedural Objections.**—Plaintiffs also challenge the adequacy of the public notice given of the hearing on the Thiermanns' application for a fill permit. The notice, dated August 17, 1985, of a hearing to be held September 18, 1985, is alleged to be substantially misleading and unlawful in that the description of work: (1) refers to "mean high water" not as "indicated by the 1985 Avener survey" but "as indicated on an earlier survey"; (2) the notice made no mention of the Thiermanns' claim that the MHWL had moved due to the March 28–29, 1984 storm; (3) the Corps did not indicate it was considering issuing a permit substantially different from that described in the notice; and (4) the Corps gave no indication that the permit it was considering issuing would be pursuant to the authority of Nationwide Permit No. 330.5(a)(13).

These objections are without merit for several reasons. First, the objection that the public was not of apprised of the storm issue is incorrect, given that the description of work in the public notice includes the statement that "the applicant states that ... material placed in 1974 settled into the river ... accelerated by natural forces of storm and weather."[37] The public was

thus clearly placed on notice of the Thiermanns' claim. Moreover, there is no reason to believe that the difference between the description of the project in the notice (180 cubic yards of fill and a concrete bulkhead) and the activity authorized by the Nationwide Permit (riprap bank stabilization along the MHWL) prejudiced the opponents of the Thiermanns' project. The riprap was to be installed at the same location as the proposed bulkhead, and was *smaller* in scale. If anything, the notice of the application for the individual permit only served to attract greater opposition. There is also no reason to believe that the failure to identify the Avener survey by name was of any consequence.[38]

More importantly, however, all of the plaintiffs' objections to the notice fail because the activity finally authorized by the Corps falls within Nationwide Permit No. 330.5(a)(13) and may be conducted by a private individual without any notice to the public or, for that matter, the Corps.[39] A hearing was conducted in this case because of the Thiermanns' original proposal, which did not fall within a nationwide permit and thus required an individual permit issued after a hearing. Because the proposal was rejected by the Corps, and the proposal finally approved required no notice or hearing, plaintiffs' objection to the proceedings on grounds of lack of notice is without substance.

### III. Conclusions

In granting permission to place riprap along the bank of the Hudson, the Corps denied the Thiermanns the permit they sought and instead authorized them to proceed in compliance with a nationwide per-

---

**36.** *See* Clean Water Act Guidelines Evaluation at 5–8, AR at 30–33. Alternatives were also discussed in the Environmental Assessment of Nationwide Permit No. 330.5(a)(13), AR at 39.

**37.** Public Notice No. 12342, Description of Work, AR at 497.

**38.** The additional claim that the MHWL shown was west and shoreward of the Avener MHWL is also of no consequence. If the line in the notice were shoreward of the actual MHWL, the Thiermanns' project would only appear to intrude *further* into the river than it actually does.

The alleged imprecision in the sketch of the project was not fatal to the adequacy of the notice.

**39.** *National Wildlife Federation v. Marsh*, 721 F.2d 767, 772–73 (11th Cir.1983); *Riverside Irrigation District v. Stipo*, 658 F.2d 762, 764 (10th Cir.1981). Although notice and comment and a hearing are provided for when a nationwide permit is promulgated, 33 C.F.R. § 330.4, activities under such a permit may be conducted without further notice, *see* 33 C.F.R. § 330.5(a).

mit already in effect. Plaintiffs have not established that the Corps' determination was arbitrary or capricious. Despite plaintiffs' varied and numerous contentions, a simple fact that cannot be downed is that the Thiermanns were entitled to place the amount of riprap that was discharged along the MHWL without submitting an application to or consulting with the Corps.

Plaintiffs' charge that the Corps has irrationally found there to be no illegal fill on the Thiermanns' property fails in light of the Corps' assessment of the available surveys and photographic evidence and the absence of any evidence of illegal filling during the time when the Avener line was created. Plaintiffs' complaint regarding notice fails because the notice given was not inadequate, and because notice is, under the circumstances of this case, unnecessary, given that the project finally approved could have been initiated under a nationwide permit requiring no application. Finally, plaintiffs' argument that the Corps has refused to consider relevant factors and alternative projects is belied by the administrative record.

Defendants' motion for summary judgment is granted.

So Ordered.