**RIVERSIDE IRRIGATION DISTRICT, and Public Service Company of Colorado, Plaintiffs,**

and

**Northern Colorado Water Conservancy District, Colorado Water Congress, National Water Resources Association, Cache La Poudre Water Users Association, Lower South Platte Water Conservancy District, Southwestern Water Conservation District, and State of Colorado, Plaintiff-Intervenors,**

v.

**Colonel William R. ANDREWS, Jr., in his official capacity as District Engineer of the U.S. Army Corps of Engineers, Omaha District, Defendant,**

and

**National Wildlife Federation, Defendant-Intervenor.**

Civ. A. No. 80–K–624.

United States District Court, D. Colorado.

July 31, 1983.

584

James R. McCotter, Timothy J. Flanagan, Kelly, Stansfield & O'Donnell, Denver, Colo., for plaintiffs.

John Hill, Jr., Dept. of Justice, Land & Natural Resources Div., Denver, Colo., Fred R. Disheroon, Dept. of Justice, Land & Natural Resources Div., Washington, D.C., Robert N. Miller, U.S. Atty., Richard A. Jost, Asst. U.S. Atty., Denver, Colo., Margot Zallen, Office of Regional Sol., Dept. of Interior, Denver, Colo., Michael Reilly, Asst. Dist. Counsel, Omaha Dist., U.S. Army Corps of Engineers, Omaha, Neb., for defendant Andrews.

Frank E. Maynes, Maynes, Bradford & Shipps, Durango, Colo., for Southwestern Water Conservation Dist.

Donald H. Hamburg, General Counsel, Glenwood Springs, Colo., for Colorado River Water Conserv. Dist.

Ward H. Fischer, James Ringenberg, Fort Collins, Colo., for Cache La Poudre Water Users Ass'n.

Kirk B. Holleyman, Aspen, Colo., for Lower South Platte Water Conservancy Dist.

Wendy Weiss, Asst. Atty. Gen., Denver, Colo., for State of Colo.

John M. Sayre, Gregory J. Hobbs, Jr., Jeffrey C. Fereday, Davis, Graham & Stubbs, Denver, Colo., for Northern Colo. Water Conservancy Dist.

Robert J. Golten, Boulder, Colo., for National Wildlife Federation.

Steven D. Ellis, Mountain States Legal Foundation, Denver, Colo., for Colo. Water Congress and National Water Resources Association.

## MEMORANDUM OPINION AND ORDER

KANE, District Judge.

This case involves the plaintiffs' construction of an earth-fill dam on Wildcat Creek in Colorado. Wildcat Creek is a tributary of the South Platte River, which is a tributary of the Missouri River, a navigable water of the United States. Because the construction of the dam involves the placement of fill material into a tributary of navigable waters of the United States, § 404 of the Clean Water Act, 33 U.S.C. § 1344, applies.

An interlocutory appeal was taken from my decision denying the government's motion to dismiss for lack of jurisdiction. These proceedings challenge the decision of the Army Corps' Engineer that the dam developers are not entitled to a nationwide temporary permit to discharge sand and gravel during the course of dam construction on a tributary of the South Platte River in Morgan County, Colorado. The Court of Appeals held that the decision of the Army Corps of Engineers that the dam developers were not entitled to the nationwide permit to discharge sand and gravel during the course of construction under nationwide permit regulations was reviewable. A nationwide permit is one covering a category of activities occurring throughout the country which involve discharges of dredged or fill material which will cause only minimal adverse effects on the environment when performed separately and which will have only minimal cumulative effects. Such a permit is automatic in that if one qualifies, no application is needed nor must notice be given before beginning the discharge activity.

As the Court of Appeals stated:

The basic consideration is Section 404 of the Clean Water Act (33 U.S.C. § 1344) and the regulations issued under its authority. The regulations concerned, 33 C.F.R. § 323.4–2, relate to work on the site during the course of construction of the dam, and more particularly to the placement of fill material (discharge of fill material) during construction. As indicated above, the regulations provide for automatic authority to place fill material if certain conditions are met. The regulations do not expressly provide that the Engineer is the one to decide whether the conditions are met and that automatic (nationwide) authority thereby exists. In any event, the Engineer did make such a determination. He decided and advised the plaintiffs that they did not qualify for an automatic permit. He reached a decision and officially advised the plaintiffs. His letter to the parties was as follows:

"Dear Mr. Douglas:

"Reference is made to our previous meetings and discussions regarding the Nationwide Section 404 permit for the Wildcat Creek Dam project.

"Since operation of the proposed reservoir could have an adverse impact on an endangered species (whooping crane), by letter dated 15 September 1978 my predecessor, Colonel James W. Ray, entered into consultation with the US Fish and Wildlife Service.

"Inclosed is a copy of the biological opinion for the project which indicates that the operation of the reservoir is likely to jeopardize continued existence of the whooping crane and adversely modify a 53-mile reach of the Platte River which is critical habitat for the crane. Accordingly, construction of the proposed dam does not qualify for 'Nationwide' authorization within the meaning of 33 C.F.R. 323.4–2(a)(1) unless you exercise one of the two alternatives outlined in the biological opinion.

"Should you elect to proceed with construction of the dam, an individual permit processed through the full public interest review will be required." *Riverside Irrigation District v. Stipo*, 658 F.2d 762 at 765–66.

It is thus clear that the Engineer did not base his decision on the issue of whether the placement of fill material during the construction of the dam would have an adverse effect on the environment but rather on whether the *operation* of the dam and the altered water flow would have an adverse impact on an endangered species whose critical habitat exists some 250 to 300 miles downstream. Both the Court of Appeals and the parties before me have assumed without contest that no problems would arise during construction. Virtually no one asserts that the construction work itself will in any way effect the crane habitat. Thus, the issue is whether the Engineer has exceeded his statutory authority. The Court of Appeals remanded the case to me ". . . for a determination whether the Engineer acted within his authority and to resolve whatever issues may remain."

A new twist has been added to this case since the opinion of the Court of Appeals. The Corps of Engineers, through Colonel Andrews who is Colonel Stipo's successor in office and in this litigation, has now attempted to require plaintiffs to apply for an individual permit pursuant to 33 C.F.R. § 323.4–4. A new and more detailed biological opinion was received in April 1982. Relying on that opinion and this other regulation, Colonel Andrews sent a letter in June 1982 ordering the plaintiffs to file for the individual permit. Moreover, Andrews contends that this act cannot be reviewed by the courts because 5 U.S.C. § 701(a)(2) precludes review when "agency action is committed to agency discretion by law."

Andrews acknowledges that this is a very narrow exception, but argues that in this instance he acted affirmatively to carry out his obligation under a clear mandate of the Endangered Species Act. He asserts that the only limit on his authority under 33 C.F.R. § 323.4–4 is that exercise of authority must be based on the concerns of the aquatic environment. Therefore, he urges, there is no legal standard for the court to apply. He further asserts that the case is now moot.

The plaintiffs argue that the issue was, and still is, whether defendant has exceeded his authority under § 404 of the Clean Water Act by considering the downstream effects of the reduced flow on the whooping crane habitat in Nebraska. The case still boils down, they say, to a question of whether the defendant can consider quantity or just quality of the water and, consequently, whether the investigation can include the effects of continuing operation within the ambit of the statutory mandate to consider the construction itself. Plaintiffs contend, and I agree, that when congress enacted the Clean Water Act, it did not intend to cut off judicial review.

Plaintiffs urge that even if their analysis is restricted to the issues as characterized by the defendant, the decision is still subject to review. The defendant states in his brief that 33 C.F.R. § 323.4–2 embodies "Congressional limitations on his discretionary authority under Section 404(e)(1)," that 33 C.F.R. § 323.4–4 limits authority to concerns based on the aquatic environment, and that individual permits may be required "in appropriate cases." Plaintiffs rejoin that this authority allows for review under 5 U.S.C. § 706(2)(A) in order to determine whether the Corps' action is "not in accordance with law."

In supplements and amendments to the complaint which I authorized from the bench, plaintiffs also address a few other issues. First they suggest that 33 C.F.R. § 323.4–4 is inconsistent with the governing statute, § 404 of the Clean Water Act, 33 U.S.C. § 1344, and should therefore be invalidated. Second, they contend that defendants should be estopped from exercising any authority conferred by § 323.4–4 because plaintiffs relied to their detriment on "misrepresentations" that this litigation would be settled on the basis of whether they qualified for a nationwide permit. Finally, they argue that § 7 of the Endangered Species Act, 16 U.S.C. § 1536 should not apply to this action since the construction is privately funded. By reading the plain language of the statute, however, it is clear that the statute encompasses any action *authorized* by any federal agency in addition to any action funded or carried out by the agency.

Given the mandate of the Court of Appeals, I am not impressed with the defendant's mootness argument. Upon the filing of this case, the matters raised in the complaint become *sub judice* and cannot be rendered moot by the ex parte action of the defendant. If, indeed, the defendant wishes to restrain me from deciding this case, he must address the mandate issued by the Court of Appeals, the authority of which, certainly exceeds that of the defendant.

■ There are only two classes of special federal water rights: reserved rights, *see,* e.g., *New Mexico v. United States,* 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978), *United States v. Cappaert,* 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976), and navigation-servitude rights, *see,* e.g., *United*

*States v. Rio Grande Irrigation Co.,* 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136 (1899). Neither of these is involved in this case. The plaintiffs attempt to characterize the defendant's actions as an attempt to create a third class of federal water rights, superseding Colorado water law and the South Platte Compact, 44 Stat. 195 (1928). The Tenth Circuit also apparently viewed the issue in this manner in its opinion:

> No one in these proceedings asserts that the *construction work* on the dam nor the placement of fill material will in any way affect the crane habitat.

658 F.2d at 767.

> Thus again the issue is reduced to the Engineer's statutory authority to control of the quantity of water released. Thus there is for all practical purposes nothing else.

658 F.2d at 768.

Following this characterization, the plaintiffs correctly point out that congress has had a long-standing deference to state water law, *see,* e.g., *California v. United States,* 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978), and that the Clean Water Act does not evidence a contrary intent in this case. Basically, they make these arguments:

1. Section 404 of the Clean Water Act is only directed at water-quality changes caused by the discharge of fill materials, and therefore does not apply to changes in water quantity caused by such discharge;

2. Section 101(g) of the Clean Water Act, 33 U.S.C. § 1251(g), demonstrates congress's intent not to affect in any substantial manner state water rights;

3. Congress could not affect state water rights in any manner inconsistent with the South Platte Compact.

Although these arguments have a superficial appeal, a more-careful analysis reveals that all are without merit. The first is clearly contrary to all of the applicable case law. The second is contrary to § 510(2) of the Clean Water Act, 33 U.S.C. § 1370(2). Finally, the third is refuted by *Pennsylvania v. Wheeling and Belmont*

*Bridge Co.,* 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1856).

Rather than characterize the defendant's actions as the creation of a new class of federal water rights, a better approach is to determine whether his actions were a proper exercise of a federal police power.

Because the plaintiffs do not dispute that the Clean Water Act was a proper exercise of congress's constitutional authority, the only question in this case is whether the defendant's actions were proper under the Clean Water Act. Analysis should therefore focus on the scope of the defendant's authority under the Clean Water Act, rather than on an emotional flummery of states' rights. Although the defendant's actions may have a substantial effect on state water rights, such is the case with many federal laws which particularly preempt state water laws. For example, a congressional designation of a river as wild or scenic under the Wild and Scenic Rivers Act, 16 U.S.C. §§ 1271–1287, will bar most dams and other diversion works from being constructed on the designated section, often limiting the exercise of state water rights. Yet this act has not been successfully challenged as an improper intrusion on state water rights.

1. *Scope of defendant's authority and obligations under § 404*

 Section 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536(a)(2), provides, in relevant part:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior], insure that any action authorized, ... by such agency ... is not likely to jeopardize the continued existence of any endangered species ... or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, ..., to be critical.

In *TVA v. Hill,* 437 U.S. 153, 173, 98 S.Ct. 2279, 2291, 57 L.Ed.2d 117 (1978), the court stated:

> One would be hard pressed to find a statutory provision whose terms were any

plainer than those in § 7 of the Endangered Species Act. Its very words affirmatively command all federal agencies 'to *insure* that actions *authorized, funded, or carried out* by them do not *jeopardize* the continued existence of an endangered species . . .' . . . [Emphasis added.] This language admits of no exception.[1]

While the Endangered Species Act does not expand the scope of federal agencies' authority, its clear language "shall insure" directs them to exercise their authority under other statutes to the fullest extent possible to carry out its aims. The question in this case is therefore whether the defendant's actions here, denial of plaintiffs' use of the nationwide permit because of potential deleterious downstream effects, was permissible under the Clean Water Act. If defendant's action was permissible under the Clean Water Act, then it was required under the Endangered Species Act.

Both parties spend considerable effort trying to distinguish between "direct" and "indirect" and between "primary" and "secondary" effects caused by the plaintiffs' project. Obviously it is usually not possible to draw a definite line between these different types of efforts. The case law, however, is clear that federal agencies are to consider many potential effects from a project on an endangered species. For example, in *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), the court held that the defendant federal agency had to consider the effects caused by water that would back up from its dam, not just the direct physical impacts of the dam. In *NWF v. Coleman,* 529 F.2d 359, 373 (5th Cir.1976), *rehearing denied,* 532 F.2d 1375, *cert. denied* under *Boteler v. NWF,* 429 U.S. 979, 97 S.Ct. 489, 50 L.Ed.2d 587 (1976), the court reversed a trial court dismissal of an environmental group's complaint that a proposed highway would damage an endangered specie's habitat:

Although it is clear that the crane can survive the direct loss of 300 acres of habitat, the evidence, . . . shows that it is questionable whether the crane can survive the additional loss of habitat caused by the indirect effects of the highway, coupled with the excavation of and drainage caused by borrow pits.

Principal among the indirect effects of the highway on the crane is the residential and commercial development that can be expected to result from the construction of the highway.

This is consistent with *North Slope Borough v. Andrus,* 642 F.2d 589, 608 (D.C.Cir.1980), where the appellate court adopted the district court's holding that, under the Endangered Species Act, caution can only be exercised if the agency takes a look at all the possible ramifications of the agency action. To the extent authorized by the Clean Water Act, the defendant therefore is required to consider indirect effects of the dams on the whoopers and their habitat.

Several courts have held that the Clean Water Act should be construed broadly to encompass deleterious environmental effects of projects. For example, in *Minnehaha Creek Watershed Dist. v. Hoffman,* 597 F.2d 617, 625–26 (8th Cir.1979), the court held that § 404 extended beyond adverse water-quality effects of projects to include potential physical effects on navigable waters caused by the discharge of chemically benign fill material.

Two district courts have held that the depletion of water, off of the project's site, is an effect that must be considered in determining whether to allow the project under § 404 of the Clean Water Act. In *United States v. Fleming Plantations,* 12 ERC 1705, 1709 (E.D.La.1978), the court granted the plaintiff's application for an injunction barring the defendants' construction of a levee that would have caused a tract of wetlands to dry up. In *Nebraska v.*

---

1. Since this opinion congress amended § 7(a)(2), changing "does not jeopardize" to "is not likely to jeopardize." While this amendment might change a federal agency's (and this court's) factual review standards, it does not change the inquiry in this case because no facts are in dispute. If there is actually a dispute on the actual effect that the dam will cause on the whooper habitat, that will have to be resolved through the individual permit process under § 404(a); the nationwide permit does not provide for such a factual inquiry.

*REA,* 12 ERC 1156, 1171–73 (D.Neb.1978), the court held that a federal agency sponsoring a dam in Wyoming and the Army Corps of Engineers were both obligated to insure that the dam's construction would not jeopardize the whoopers' habitat downstream in Nebraska. The court invalidated an individual § 404 permit for the dam because these agencies had not made the necessary assurances.

Because the Clean Water Act allows federal agencies to consider deleterious downstream environmental effects from a project and because the Endangered Species Act requires federal agencies to take whatever measures are necessary, within their authority, to protect an endangered species and its habitat, the defendant in the present case was required to halt the plaintiffs from proceeding under the nationwide permit when their project had the potential of adversely affecting the whoopers and their habitat downstream from the project.[2]

### 2. Effect of § 101(g) of the Clean Water Act

■ Section 101(g) of the Clean Water Act, 33 U.S.C. § 1251(g), provides:

It is the policy of Congress that the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated, or otherwise impaired by this chapter. It is the further policy of Congress that nothing in this chapter shall be construed to supersede or abrogate rights to quantities of water which have been established by any State. Federal agencies shall cooperate with State and local agencies to develop comprehensive solutions to prevent, reduce and eliminate pollution in concert with programs from managing water resources.

The plaintiffs argue that this section demonstrates that congress intended not to interfere with state water rights and interstate water compacts in enacting the Clean Water Act. While this argument is appealing, especially in light of the strong language of § 101(g), it should be rejected.

First, congressional policy statements "cannot nullify a clear and specific grant of jurisdiction, even if the particular grant seems inconsistent with the broadly stated purpose." *Connecticut Light & Power Co. v. Federal Power Commission,* 324 U.S. 515, 527, 65 S.Ct. 749, 754, 89 L.Ed. 1150 (1945). Here § 510(2) of the Act, 33 U.S.C. § 1370(2), which is not a policy statement, provides,

*Except as expressly provided in this chapter,* nothing shall . . . be construed as impairing or in any manner affecting any right of jurisdiction of the States with respect to the waters . . . of such States. [Emphasis added.]

Because both the statements of § 101(g)'s sponsor and the relevant committee report state that § 101(g) was not intended to change existing law, including § 510(2), congress did not intend to limit § 404's scope where it might affect state water-rights law when it enacted § 101(g).

The plaintiffs' argument is further diminished because the defendant's actions did not abrogate or supersede any state water rights. As discussed above, the defendant only placed conditions on the construction of the dam that might affect the plaintiffs' water rights. While the defendant is barring the plaintiffs from exercising their water rights in a manner inconsistent with federal law, he is not taking away the rights. They may still be utilized, so long as in a manner consistent with federal law.

### 3. Applicability of the South Platte Compact

■ The plaintiffs' final argument is that the defendant's action was improper because of the South Platte Compact, 44 Stat. 195 (1928). They argue that congress could not pass a clean water act that would impair this previously approved compact. This argument should be rejected. It is true that congress cannot unilaterally reserve the right to amend or repeal an interstate compact. *Tobin v. United States,* 306 F.2d 270, 273 (D.C.Cir.1962). This does not

---

**2.** *See Bayou des Familles Dev. v. U.S. Corps of* Engineers, 541 F.Supp. 1025 (1982).

mean, however, that approving a compact limits congress's authority later to enact federal laws. In *Pennsylvania v. Wheeling, supra,* the court held:

> The question here is, whether or not the compact can operate as a restriction upon the power of congress under the constitution to regulate commerce among the several states? Clearly not. Otherwise congress and two States would possess the power to modify and alter the constitution itself.

A subsequent federal law of nationwide applicability will therefore be enforceable even if it affects a prior compact. Congress therefore did not limit its authority to enact the Clean Water Act when it approved the South Platte Compact.

### CONCLUSION

Resolution of this case depends largely on its characterization. If the case is characterized as an attempt by the defendant to condemn the plaintiffs' Colorado water rights, then the plaintiffs' should obviously prevail. On the other hand, if the case is characterized as an attempt by the defendant to exercise federal police power in a manner required by federal statutes, then the defendant should prevail, even if his actions affect the plaintiffs' exercise of their water rights. For the reasons set out above, I believe that the latter characterization is preferable, and that the defendant's actions were a proper exercise of federal police power, even though they will clearly affect the plaintiffs' exercise of their water rights. I must limit my decision to the propriety of the exercise of such power. Whether it is prudent to vest such power is a political question which must be addressed to congress not the courts.

In accordance with the mandate of the Court of Appeals, I hold that the Engineer acted within his authority.

IT IS ORDERED that plaintiffs complaint is hereby dismissed. Judgment shall enter for defendant. Each party to bear his own costs.