**Robert O'CONNOR, Plaintiff,**

v.

**CORPS OF ENGINEERS, UNITED STATES ARMY, Michael P.W. Stone, Secretary of the Army, General Henry T. Hatch, Chief Engineer, and Gary R. Mannesto, Chief, Regulatory Functions Branch of Detroit District of Engineers, Defendants.**

Civ. No. H91–172.

United States District Court,
N.D.Indiana,
Hammond Division.

June 30, 1992.

186

James T. Harrington, Charles W. Wessel-hoft, Darren J. Hunter, Ross & Hardies, Chicago, Ill., David Ranich, East Chicago, Ind., for plaintiff.

Orest Szewciw, Asst. U.S. Atty., Dyer, Ind., Alan D. Greenberg, Rebecca A. Lloyd, Trial Attys., Environmental Defense Section, Environmental & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for defendants.

ORDER

MOODY, District Judge.

This matter is before the court on the parties' cross-Motions for Summary Judgment, filed January 30, 1992, and March 23, 1992. Both motions concern plaintiff's administrative appeal of several actions taken by the United States Army Corps of Engineers ("Corps") with regard to the fill of .41 acres of wetland on plaintiff's property. First, the Corps required plaintiff to apply for an after-the-fact, individual permit for the fill of the .41 acres of wetland; the Corps refused to consider plaintiff's development project under what is called the nationwide permit program. Then, on October 24, 1990, the Corps denied plaintiff's application for an individual permit and issued a Restoration Order requiring plaintiff to return the acreage to its original condition.

Defendants ask the court to uphold all of the actions taken by the Corps. Defendants assert that the Corps properly exercised its statutory authority, and that, based on the administrative record, the Corps acted reasonably when it denied plaintiff an individual permit and issued the Restoration Order. Plaintiff, on the other hand, asks the court to (1) reverse the Corps' decision to deny plaintiff an individual permit, (2) declare that plaintiff is entitled to proceed with his development project under either a nationwide or individual permit, and (3) enjoin the Corps from enforcing its Restoration Order. Plaintiff argues that the Corps acted both outside of its statutory authority when it refused to treat plaintiff's development project under the nationwide permit program and arbitrarily and capriciously when it denied plaintiff an individual permit. Plaintiff further argues that the Corps violated his constitutional right to due process when the Corps, without notice or hearing, decided to review plaintiff's development project under the individual permit program as opposed to the nationwide permit program. Finally, plaintiff claims that the Corps engaged in an unconstitutional taking when it denied him an individual permit and issued the Restoration Order.

For the following reasons, the court GRANTS defendant's Motion for Summary Judgment, DENIES plaintiff's Cross–Motion for Summary Judgment, AFFIRMS the Corps' decision to deny plaintiff an individual permit for the fill of .41 acres of wetland and UPHOLDS the Corps' Restoration Order of October 24, 1990.

*The undisputed facts:*

Plaintiff owns approximately seven and one-half acres of land on Sagauny Lake in LaPorte County, Indiana, four acres of which is wetland.[1] In May of 1989, plaintiff began filling a portion of the wetland for the purpose of developing a jogging track, tennis court and swimming pool. R. 99 and 144. These recreational facilities were part of a larger development project which also included the construction of a new house, parking lot, lawn, septic tank and drainage field. R. 99. Apparently, as early as August of 1988, plaintiff sought advise from the Corps as to whether a permit would be necessary for the construction project. R. 6. At that time, the Corps concluded that a permit would not be necessary for the work proposed, because, according to the proposal, the excavated material was to be placed upland and not in the wetland. R. 21. The Corps, though, informed plaintiff that "[a]ny deviation from the attached plans without prior approval may invalidate this determination of no permit required." R. 21.

In May of 1989, the Corps became aware that plaintiff was in fact filling portions of the wetland on his lake-front property, and by letter, the Corps ordered plaintiff to

1. Plaintiff's lake-front property is known by the address of 7998 N. 600 E., Rolling Prairie, Indiana.

stop such activity until the Corps determined whether plaintiff's actions violated section 404 of the Clean Water Act, 33 U.S.C. § 1344. R. 26. A Corps engineer then inspected the site and found that plaintiff had in fact placed 1,540 cubic yards of fill in the wetlands (.41 acres worth). R. 71. The inspector concluded that there was no potential need for initial corrective or remedial measures, but he did find that the fill would "directly affect the water quality of Sagauny Lake." R. 71–72. Based on the inspector's report, the Corps determined that a 404 violation had occurred, R. 93, and on July 13, 1989, the Corps informed plaintiff of its conclusion.

Plaintiff then requested that the Corps accept plaintiff's application for an after-the-fact permit pursuant to the Corps' nationwide permit program, specifically a nationwide 26 permit, and the Corps agreed. R. 99, 102 and 166. The application stated that, aside from the .41 acres of wetland already filled, plaintiff intended to fill an additional .60 acres of wetland. R. 146. Upon a review of the application, the Corps determined that plaintiff should be required to apply for an individual permit, based on the Corps' finding that approximately six acres of wetland and Sagauny Lake would be adversely affected by plaintiff's proposed project. R. 153 and 156. After being advised of the Corps's conclusions, plaintiff submitted a revised application for a nationwide 26 permit, in which plaintiff scaled back his proposal to less than one acre of fill, .71 acres in all. R. 167.

The Corps, though, continued to insist on an individual permit application from plaintiff; the Corps concluded that even the existing fill of .41 acres required an individual permit based on its potentially adverse affect on the adjacent wetlands and sixty-five acre lake. R. 176, 177 and 181. Plaintiff requested an explanation for the Corps decision, R. 180, and, on March 3, 1990, the Corps complied with plaintiff's request. By letter, the Corps explained that, "based on the information collected, it was [the Corps'] determination that projects such as this viewed cumulatively may have more than minimal adverse effects on the aquat-

ic environment." R. 181. The "information" to which the Corps referred was the fact that Sagauny Lake is a "unique waterbody with exceptional water quality," surrounded by wetlands that "provide important contributions to that water quality." R. 181. The Corps further explained that, up until that time, no formal decision had been made on whether plaintiff's project may proceed under a nationwide 26 permit, and that, now, the Corps determined that "important issues would be best addressed through the individual permit process." R. 181.

The Corps then proceeded to process plaintiff's application through the individual permit process. The Corps issued a public notice of the application and gave plaintiff an opportunity to respond to any objections received. In opposition to plaintiff's project, the Corps received 136 letters from concerned residents, as well as objections from the Environmental Protection Agency ("EPA"), the United States Department of the Interior, Fish and Wildlife Service, the Indiana Department of Environmental Management, the Indiana Department of Natural Resources and the LaPorte County Health Department. By letter, dated June 26, 1990, the Indiana Department of Environmental Management informed the Corps that it had denied state water quality certification for plaintiff's project. R. 320–321. On that same day, the Corps wrote to plaintiff asking him to respond to these objections, emphasizing the need for plaintiff to address practicable alternatives that might exist. R. 627.

When plaintiff failed to respond, the Corps assumed practicable alternatives existed, and, on October 24, 1990, the Corps denied plaintiff an individual permit as contrary to the public interest and issued a Restoration Order. R. 677 and 678. Plaintiff then requested that the Corps stay its Restoration Order and reopen plaintiff's permit application so as to allow him to submit additional information and to respond to the public's objections. The Corps agreed, though it informed plaintiff that it would be very unlikely that the Corps would reverse its decision to deny plaintiff

an individual permit. R. 703–705. Plaintiff submitted a revised application, this time scaling his project back even more; plaintiff would fill no more than the .41 acres of wetland already filled. R. 709.

The Corps then sent out a second public notice, and again, the Corps received objections from the EPA, the United States Department of Interior, Fish and Wildlife Service, the Indiana Department of Natural Resources and the Indiana Department of Environmental Management. Each of these agencies claimed that even plaintiff's scaled back project would adversely affect the surrounding aquatic resources. The agencies also found that plaintiff had not adequately addressed practicable alternatives. Finally, the Indiana Department of Environmental Management denied water quality certification for plaintiff's revised project. The Corps agreed with the other agencies that the .41 acres of fill would adversely impact the "unique waterbody of Sagauny Lake" and that "the detriments [of the project] overwhelmingly outweigh the benefits that will accrue to [plaintiff] and the overall public interest." R. 773. The Corps further found that plaintiff had failed to address adequately practicable alternatives. R. 771–772. On April 25, 1991, the Corps denied plaintiff an individual permit for his revised project and reinstated its Restoration Order. R. 817.

*Standard of review:*

■ This matter is before the court on the parties' cross-motions for summary judgment. Summary judgment is appropriate only when there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.Proc. 56. The parties do not dispute the facts, as contained in the administrative record. Therefore, the only question for the court is which party, if any, is entitled to judgment as a matter of law. In that this is an administrative appeal, the court's basic inquiry is (1) did the Corps reasonably interpret its enabling statute, section 404 of the Clean Water Act, 33 U.S.C. § 1344, and (2) did the Corps rationally apply this interpretation to the facts of this case. *Bersani v. United States Environmental Protection Agency,* 674 F.Supp. 405, 412 (N.D.N.Y.1987).

To answer these two questions, one must look to the Clean Water Act ("CWA") and its regulations for guidance. The CWA does not specify the standard of review of Corps decisions. Consequently, the court looks to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.,* for the appropriate standard to apply. Under the APA, a court cannot overturn a decision of an agency unless the decision is either (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," (2) contrary to the constitution, (2) in excess of the agency's statutory authority, or (3) "without observance of procedures required by law." 5 U.S.C. § 706(2)(A), (B), (C) and (D). Moreover, the standard of review is a highly deferential one. While a court must make a "searching and careful inquiry into the facts" in determining "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment ... the ultimate standard of review is a narrow one." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). The court will not substitute its own judgment for that of the agency; as long as the agency provides a rational explanation for its decision, the court cannot disturb it. *Id.* at 416, 91 S.Ct. at 823.

■ Thus, the court defers substantially to the Corps' interpretation and application of the CWA. *Chevron, U.S.A., Inc. v. Natural Resources Defense,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Inland Steel Co. v. Environmental Protection Agency,* 901 F.2d 1419, 1424 (7th Cir.1990); *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 910 (5th Cir.1983). Moreover, the court defers even more to the Corps' interpretation and application of its own regulations that accompany the CWA. *Ford Motor Co.,* 444 U.S. at 566, 100 S.Ct. at 797. Congress delegated substantial authority to the

Corps for the implementation of the CWA's dredge-and-fill permit program as codified in section 404, 33 U.S.C. § 1344. *Avoyelles*, 715 F.2d at 911. Therefore, as long as the Corps' interpretations and applications of section 404 and its accompanying regulations are reasonable, the court will adopt them. *Chevron*, 467 U.S. at 845, 104 S.Ct. at 2783; *Avoyelles*, 715 F.2d at 911.

*Section 404 of the CWA and its regulations:*

Section 404 of the CWA authorizes the Secretary of the Army, acting through the Corps, to issue permits "for the discharge of dredged or fill material into navigable waters at specific disposal sites." 33 U.S.C. § 1344(a) and (d). Before issuing a 404 permit, though, the Corps must first issue a notice of the permit application and provide the public with an opportunity for a hearing. 33 U.S.C. § 1344(a). Furthermore, the Corps cannot issue a 404 permit unless the applicant has received state certification that the proposed project will comply with state water quality standards. 33 U.S.C. § 1341(a); 33 C.F.R. § 320.4(j)(1).

The regulations accompanying section 404 of the CWA outline the general policies that must guide the Corps when it decides whether or not to issue a 404 permit. "The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.-4(a). Ultimately, the Corps must balance the "benefits which reasonably may be expected to accrue from the proposal ... against the reasonably foreseeable detriments." *Id.* This balancing analysis requires a consideration of several factors, including among other things, the cumulative effect of the proposed project on the economy, "general environmental concerns, wetlands, fish and wildlife values," as well as the existence of any practicable alternatives. *Id.* And, where a dredge-and-fill permit application does not concern a water dependent project, the Corps is to assume that practicable alternatives exist, unless the applicant "clearly demonstrates otherwise." 40 C.F.R. § 230.10(a)(3). This presumption of practicable alternatives "is *very strong*," *Buttrey v. United States*, 690 F.2d 1170, 1180 (5th Cir.1982); as the regulations state, the "unnecessary alteration or destruction of [wetland] should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b)(1).

Moreover, the regulations specifically target wetlands as a "productive and valuable public resource ... the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b). Where a permit application concerns only a minor alteration of the wetlands, the Corps may still deny it on the grounds that "the cumulative effect of numerous piecemeal changes [like the one proposed will] result in a major impairment of wetland resources." 33 U.S.C. § 320.4(b)(3).

The CWA, though, provides that the Corps can issue general 404 permits on a state, regional or nationwide basis under certain circumstances. 33 U.S.C. § 1344(e). These general permits are allowed where the proposed dredge-and-fill activities "will cause only minimal adverse environmental effects when performed separately, and will have only [a] minimal cumulative adverse effect on the environment. 33 U.S.C. § 1344(e)(1). 33 C.F.R. § 330.5 lists activities that are eligible for a general permit, and one such activity is the discharge of dredged or fill material into non-tidal water which cause the "loss or substantial adverse modification" of less than ten acres of waters of the United States, including wetlands. 33 C.F.R. § 330.5(a)(26) (nationwide 26 permit). Where the discharge involves the fill of between one and ten acres of waters, including wetlands, an applicant must notify the Corps of such activity and receive Corps authorization before proceeding. C.F.R. § 330.5(a)(26) and 330.7.

The Corps, though, can require an applicant for a nationwide 26 permit to apply for an individual permit instead. The Corps can do so under two circumstances. First is when the application concerns waters that are already identified by or of importance to other federal and state agencies, and, after being notified of the nationwide

permit application, those agencies opine that an individual permit should be required. 33 C.F.R. § 330.7(c) and (d). Second is when the Corps, on its own initiative, exercises its discretionary authority to "override nationwide permits by requiring individual permit applications on a case-by-case basis...." 33 C.F.R. § 330.8. This latter option is available when the Corps determines that the CWA's "concerns for the aquatic environment," as enunciated in the EPA guidelines, 40 C.F.R. § 230.10, would be better served by the more in depth review required by the individual permit application process. *Id.* The EPA guidelines suggest that the Corps consider the availability of practicable alternatives and the adverse impact the project poses on endangered species, wildlife dependent upon the aquatic ecosystem, wetlands and water quality. 40 C.F.R. § 230.10(a) and (b).

Of great importance to this appeal is the fact that 33 C.F.R. § 330.5(a)(26) does not require notification of the Corps for activities that involve the discharge of dredged or fill material into waters "which cause the loss or substantial adverse modification of" less than one acre of waters, including wetlands.[2] Thus, such activities are automatically authorized under the Corps' nationwide 26 permit program. *Accord, Shelton v. Marsh,* 902 F.2d 1201, 1205 (6th Cir.1990), *and Riverside Irrigation District v. Stipo,* 658 F.2d 762, 764 (10th Cir. 1981). Whether the Corps can still require an individual permit for these activities though is unclear. 33 C.F.R. § 330.8 refers in general terms to nationwide permits when it speaks of the Corps' discretionary authority to override them, which would seem to encompass nationwide 26 permits for fill activities "which cause the loss or substantial adverse modification of" less than one acre of wetlands.

Yet, 33 C.F.R. § 330.8(d) addresses the procedures by which the Corps can modify, suspend or revoke a nationwide 26 permit, and the regulation states that the Corps can do so only after the nationwide permitee notifies the Corps pursuant to § 330.7. That suggests that the Corps can only modify, suspend and revoke a nationwide 26 permit if the permit covers activities involving the fill of between one and ten acres, leaving fill activities "which cause the loss or substantial adverse modification of" less than one acre of wetland immune from the Corps' discretionary authority. The court, though, does not attempt to clarify these outerlimits of the Corps' discretionary authority under § 330.8, for the Corps found and, as explained in the next section of this order, this court agrees, that plaintiff's fill activities affect more than one acre of wetland. Consequently, this case involves the "loss or substantial modification of" more than one acre of wetlands, and, all agree that, under § 330.8, the Corps' discretionary authority to override a nationwide 26 permit program for such activity is clear.

*The Corps' decision to require plaintiff to apply for an individual permit:*

 Plaintiff claims that the Corps exceeded its statutory authority under the CWA when it refused to consider plaintiff's application as one for a nationwide 26 permit and required plaintiff to apply for an individual permit instead. Plaintiff argues that the Corps did not have the discretionary authority to require an individual permit, because under his final, scaled-back proposal, the total amount of wetlands filled on his property did not exceed one acre (.41 acres to be exact). Plaintiff's argument is based on the following interpretations of 33 C.F.R. § 330.5(a)(26) and § 330.8, the CWA regulations that establish the nationwide 26 permit program and the Corps' discretionary authority to both

**2.** 33 C.F.R. § 330.5(a)(26) reads in pertinent part as follows:

"Discharges of dredged or fill material into waters listed in paragraphs (a)(26)(i) and (ii) of this section except those which cause the loss or substantial adverse modification of 10 acres or more of such waters of the United States, including wetlands. For discharges

which cause the loss or substantial adverse modification of 1 to 10 acres of such waters, including wetlands, notification to the district engineer is required in accordance with § 330.7 of this Part."

Paragraphs (i) and (ii) of the regulation restrict the nationwide 26 permit to non-tidal water activities.

override a nationwide permit and require an individual permit instead.

First, plaintiff interprets the scope of the nationwide 26 permit program quite broadly. Plaintiff argues that, under § 330.-5(a)(26), a general permit is available for the fill of less than ten acres, regardless of any future impact the fill may have on adjacent wetlands or other aquatic resources. Consequently, for activities that fall within the nationwide 26 permit program, notification of the Corps would be necessary only for activities that involve the actual fill of wetlands amounting to between one and ten acres of wetland; the fill of less than one acre of wetland would be automatically authorized under § 330.-5(a)(26), regardless of whether or not its future impact on aquatic resources would effect adversely more than one acre. Plaintiff claims that his proposed project—the fill of .41 acres of wetland—falls within this latter category, because the Corps did not submit evidence that the .41 acres of filled wetland has in fact harmed more than one acre of wetland.

On the other hand, plaintiff narrowly interprets the Corps' discretionary authority under § 330.8 to override a nationwide 26 permit. Plaintiff claims that, under § 330.8, the Corps can require an individual permit where a nationwide 26 permit would otherwise be proper only when the activity involved requires prior notification of the Corps, i.e., activities that involve the fill of between one and ten acres of wetland. In other words, activities that involve the fill of less than one acre, regardless of their impact, are automatically authorized under § 330.5(a)(26) and the Corps has no authority under § 330.8 to override that automatic approval. Thus, according to plaintiff, the Corps had no authority to make plaintiff apply for an individual permit for the fill of the .41 acres of wetland on his property.

The Corps, on the other hand, argues that the nationwide 26 program is not so far reaching as plaintiff asserts and that the Corps' authority to override it justified its actions in this case. Unlike plaintiff, the Corps' reads § 330.5(a)(26) to cover only those activities that do not affect, either presently or in the future, wetlands and other aquatic resources that amount to less than ten acres in size. The Corps believes that the language "which cause the loss or substantial adverse modification" means more than just the immediate impact a discharge of dredged or fill material has on wetlands and other aquatic resources. The Corps believes that, in determining whether a proposal falls within the nationwide 26 permit program, it can take into consideration not only the harm to wetlands actually filled, but also the harm to other wetlands or water that potentially will be lost or substantially adversely modified by the proposal in the future.

Under this narrower interpretation of § 330.5(a)(26), an individual permit would be required if the proposal affected more than ten acres of wetland, even though the applicant proposed to fill less than ten acres of wetland. Moreover, notification of the Corps under § 330.5(a)(26) would be required for all activities that affect adversely one to ten acres of wetland, even though the activity entailed only the actual fill of less than one acre of wetland. The Corps determined that plaintiff's proposal—the fill of .41 acres of wetland—was just such an activity. The Corps found that the .41 acres of filled wetland on plaintiff's property will in time affect adversely up to 6 acres of wetland, plus the water quality of and other environmental benefits attributed to Sagauny Lake. Accordingly, the Corps determined that plaintiff's proposed project fell within the category of activities under the nationwide 26 permit program that required prior Corps approval, i.e., activity that affected one to ten acres of wetland. The Corps then exercised its discretionary authority under § 330.8 and required plaintiff to apply for an individual permit.

The court agrees with and adopts this narrower interpretation of the scope of the exemptions created under the nationwide 26 permit program. § 330.5(a)(26) states that a general permit is available for dredge-and-fill activities that "cause the loss or substantial modification of" less than ten acres of "waters of the United States, including wetlands." 33 C.F.R.

§ 330.5(a)(26). Basically, the parties dispute the meaning and scope of the word "cause" as used in the regulation. Plaintiff would limit the word to the present or past tense, so that any future affect that a dredge-and-fill activity might have on waters of the United States, including wetlands, would be irrelevant and beyond the scope of the Corps' regulatory powers under the CWA. The Corps sees the word "cause" as encompassing present, past and future effects on the waters of the United States, including wetlands, thus giving the Corps a longterm mechanism for monitoring the erosion of the wetlands and surrounding aquatic resources.

The court adopts this latter more expansive use of the word "cause" as it is used in § 330.5(a)(26). Congress enacted the CWA for the purpose of restoring and maintaining the "chemical, physical, and biological integrity of the Nation's waters." 33 C.F.R. § 1251(a)(1). This long range goal was further codified into the 404 permit program for the dredge-and-fill of wetlands. The regulations accompanying section 404 speak repeatedly of the cumulative impact that a dredge-and-fill activity might have on surrounding aquatic resources, and the Corps is specifically charged with weighing the benefits "expected to accrue" therefrom against any "foreseeable detriments" associated therewith. 33 C.F.R. § 320.4(a). Thus, the emphasis the CWA places on the future protection and maintenance of the waterways cannot be more evident, and what better way is there to accomplish this long term goal but to interpret the word "cause" prospectively.

Thus, the court defers to the Corps' interpretation of § 330.5(a)(26) as not only reasonable but also consistent with the purposes of the CWA. *Chevron*, 467 U.S. at 845, 104 S.Ct. at 2783; *Inland Steel*, 901 F.2d at 1424; *see also, Texas Municipal Power Agency v. Admiral of United States Environmental Protection Agency*, 836 F.2d 1482, 1488 (5th Cir.1988) (court must defer to any reasonable EPA construction of its enabling statute and regulations, including regulation creating treatment pond exemption); *United States v. Cumberland Farms of Connecticut, Inc.*,

826 F.2d 1151, 1157 (1st Cir.1987) (Corps' narrower interpretation of its regulation creating "headwaters" nationwide permits should prevail). The language of § 330.-5(a)(26), especially when read together with the purposes of the CWA, in no way "compels" plaintiff's broader interpretation, and the Corps' interpretation of the language far from "deforms" it. *Inland Steel*, 901 F.2d at 1424.

Finally, other courts also have both adopted this forward looking interpretation of § 330.5(a)(26) and upheld decisions of the Corps to either override a nationwide 26 permit or deny an individual permit altogether where the proposed activity affects prospectively more than one acre of waters, including wetlands. *See e.g., City of Alma v. United States*, 744 F.Supp. 1546, 1562–1563 (S.D.Ga.1990) (court upholds EPA denial of individual permit on grounds that construction project "would result in the destruction and loss of vegetated wetland habitat ... and would adversely affect ... the forested wetland"); *Riverside Irrigation District v. Andrews*, 568 F.Supp. 583, 589 (D.Co.1983) (Corps' decision to deny nationwide permit reasonable given finding that project "could have an adverse impact on an endangered species"); *P.F.Z. Properties, Inc. v. Train*, 393 F.Supp. 1370, 1381 (D.D.C.1975) (Corps reasonable to deny plaintiff an individual permit where proposed construction project, among other things, "likely to harm substantially the remaining wetlands"). In contrast to these cases, the court in *Shelton v. Marsh*, 902 F.2d 1201 (6th Cir.1990), applied this forward looking interpretation of § 330.-5(a)(26) and upheld the Corps' decision to supersede an individual permit and grant the permitee a nationwide 26 permit. The court based its ruling on its finding that the Corps reasonably determined that the project "would affect only 8.5 acres of wetland area...." *Shelton*, 902 F.2d at 1203.

In fact, the *Riverside Irrigation* court directly addressed the issue of what tense should be given to the language of § 330.-5(a)(26). Like in this case, the applicant in *Riverside* argued on appeal that the Corps exceeded its statutory authority under the

CWA when it considered the downstream, adverse effects of the applicant's proposed dam on an endangered specie, the whooping crane. *Riverside*, 568 F.Supp. at 586. Based on that assessment, the Corps denied the appellant a nationwide permit to discharge sand gravel during the course of building the dam. *Id.* at 585. The applicant argued that the Corps could not consider anything but the present, direct, physical effects the discharge had on the whooping crane. *Id.* at 588. The court rejected this argument and held that, under the CWA, not only was the Corps "required to consider [the] indirect effects of the dam on the whoopers and their habitat," *id.*, but also, in general, "the Clean Water Act allows federal agencies to consider deleterious downstream environmental effects from a project...." *Id.* at 589. The *Riverside* court's broad interpretation of the Corps' statutory authority under section 404 of the CWA is synonymous with the interpretation adopted by this court today.

Accordingly, like the *Riverside* court, this court AFFIRMS the Corps' decision to require plaintiff to apply for an individual permit under section 404 of the CWA. Plaintiff's proposal—the fill of .41 acres of wetland—had the potential of affecting adversely more than one acre of wetland, as well as the waters of Sagauny Lake. Therefore, plaintiff's activities fell within the one to ten acre category of § 330.-5(a)(26), and, assuming such, even plaintiff does not dispute that the Corps had the discretionary authority to require an individual permit. 33 C.F.R. § 330.8.

Neither does plaintiff dispute nor does the record in any way suggest that the Corps violated the procedures for overriding the nationwide 26 permit program. Upon learning of plaintiff's fill activities, the Corps immediately told plaintiff to stop until the Corps determined whether a permit, if any, would be required. The Corps then notified interested state and federal agencies pursuant to § 330.7(c), and, upon receiving opinions from those agencies that an individual permit should be required, recommended the same. Then, after providing plaintiff with an opportunity to rebut, the Corps ultimately exercised its dis-

cretionary authority under § 330.8 and required plaintiff to submit an application for an individual permit. The Corps based its invocation of this authority on its findings that the .41 acre of fill would significantly affect Sagauny Lake and its adjacent wetlands, which are crucial to the maintenance of the lake's unique water quality. The Corps also relied on its determination that practicable alternatives existed. The Corps therefore looked at all of the relevant characteristics of plaintiff's proposal, 40 C.F.R. § 330.10, and came to the conclusion that the more in depth review required for an individual permit would better serve the public interest and the CWA. Thus, the Corps properly exercised its discretionary authority under § 330.8 and required plaintiff to submit an application for an individual permit.

*The Corps' decision to deny plaintiff an individual permit and issue a restoration order:*

█ Plaintiff argues that, even if the Corps properly considered his application under the individual permit program, as opposed to the nationwide 26 permit program, the Corps acted arbitrarily and capriciously when it denied plaintiff's application. Plaintiff disputes the Corps' finding that plaintiff's application did not adequately address practicable alternatives. Plaintiff argues that he has scaled back his project significantly and that there is no other configuration for the development proposed. Plaintiff further argues that he owns only one other undeveloped lot and that there are no other lots available for him to purchase.

Thus, plaintiff's only bone of contention with the Corps' decision is the issue of practicable alternatives. Plaintiff does not argue that the Corps followed the wrong procedures when it denied plaintiff an individual permit. In fact, as section 404 of the CWA requires, the Corps went out of its way to both notify the public of plaintiff's proposal (both in its original and revised form) and provide all concerned with an opportunity to object, including plaintiff. Furthermore, plaintiff does not dispute the fact that, with regard to each project pro-

posed, including the last, the State of Indiana denied plaintiff state water quality certification, a fact that basically resolves this portion of the appeal against plaintiff. 33 U.S.C. § 401(a) (Corps cannot issue a 404 permit without prior state water quality certification). Nevertheless, the court addresses plaintiff's argument.

The court is left with but one question. Did the Corps make a reasonable determination, based upon all of the relevant material before it, that the danger to the surrounding aquatic resources posed by plaintiff's dredge-and-fill project far outweighed the benefits associated therewith. Embodied within that question is the issue of practicable alternatives. Should practicable alternatives exist, the danger posed is much more likely to outweigh any potential benefits, since the cost to plaintiff of avoiding the harm altogether will not be great. 33 C.F.R. § 230.10(a). Moreover, the CWA regulations tell us that if plaintiff inadequately has addressed the issue of practicable alternatives, the Corps must presume that practicable alternatives exist. 33 C.F.R. § 230.10(a)(3).

The Corps made the following findings regarding the fill of .41 acres of wetland on plaintiff's property. The Corps found that "the revised plans have reduced, but not eliminated the adverse impacts associated with the project." R. 772. The Corps determined that "the project would have detriments to water quality, aquatic resources, terrestrial resources, wetlands, aesthetics, and recreation," and that the project violated section 404 of the CWA based on a presumption of less damaging practicable alternatives.

On this latter point, the Corps found plaintiff's attempt to rebut the presumption of practicable alternatives disingenuous. First of all, plaintiff limited his search for alternative, lake-front lots to Sagauny Lake, ignoring land around nearby Hudson Lake. Second, the Corps rejected plaintiff's contention that the purchase of an alternative piece of property would be cost prohibitive; according to the Corps, such a statement "is not supported by any data which would allow one to reach this conclusion." Finally, the Corps determined that, as to plaintiff's Sagauny Lake property, a reconfiguration of the proposed plan was feasible. In fact, the Corps found that, "[w]hile the applicant has claimed that use of the upland portion has been maximized, the site layout on the upland portion of the property, has remained visibly unchanged throughout the evolution of their plans." R. 772. The Corps determined that plaintiff had failed to consider the project as a whole when revising his plans. Id.; accord, Sylvester v. United States Army Corps of Engineers, 882 F.2d 407, 409–410 (9th Cir.1989) (Corps properly considered necessity of golf course in relation to proposed resort project as a whole). Instead of scaling back portions of his development project targeted for the upland portion, i.e., the new house, parking lot, driveway and lawn, plaintiff only scaled back that which directly affected the wetlands. Id. In other words, if plaintiff had scaled back the facilities earmarked for the upland area, perhaps the tennis court could have been placed elsewhere (or nowhere at all), and there would have been no need to touch the wetlands at all.

Thus, the Corps found that plaintiff failed to address existent, practicable alternatives, and, ultimately, the Corps concluded that, "[b]ased on the foreseeable adverse impacts that this project will have on the unique waterbody of Sagauny Lake, the detriments overwhelmingly outweigh the benefits that will accrue to [plaintiff] and the overall public interest." R. 773. The Corps' conclusions not only mirror but also are based upon the opinions submitted by the EPA, the United States Department of Interior, Fish and Wildlife Service, the Indiana Department of Natural Resources and the Indiana Department of Environmental Management. All of these agencies continued to object to plaintiff's proposed plan, even after plaintiff scaled back his dredge-and-fill activities to just the .41 acres of wetland already filled. R. 757, 759, 760 and 765.

Sagauny Lake is known for the unique purity of its water, a quality crucial to the survival of the fish and wildlife inhabiting it and the surrounding land. Moreover,

Sagauny Lake in its present, untouched state provides the public with an exceptional, recreational facility. Yet, all of these attributes depend upon the wetlands surrounding Sagauny Lake; without the wetlands, those things treasured most about the lake would not still exist. *Accord, United States v. Byrd*, 609 F.2d 1204, 1210 (7th Cir.1979). Consequently, the Corps concluded that even the fill of as little as .41 acres of wetland, when considered with the cumulative effect of other such minor changes, *see* 33 C.F.R. § 320.4(b)(3), placed the preservation of both Sagauny Lake and its surrounding wetlands in too great a danger to be allowed. Its Restoration Order followed.

Thus, the Corps carefully and extensively considered the impact of, alternatives to, and public opinions regarding plaintiff's project before it denied plaintiff's application for an individual permit and ordered plaintiff to restore the .41 acres of wetland to its original condition. *Buttrey*, 690 F.2d at 1185; *Parkview Corp. v. Department of Army, Corps of Engineers, Chicago District*, 490 F.Supp. 1278, 1285 (E.D.Wisc.1980). The Corps' conclusions as to the extent of the potential harm posed by plaintiff's project are based on a reasoned evaluation of all of the evidence relevant to this case, and the Corps carefully explained its position to plaintiff when asked to do so. Accordingly, the court cannot find that the Corps acted arbitrarily or capriciously with regard to plaintiff's permit application, *id.*, and the court is in no position to disturb the Corps' decision to deny it. *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823; *Avoyelles*, 715 F.2d at 911; *Parkview Corp.*, 490 F.Supp. at 1285.

Consequently, the court AFFIRMS the Corps' decision to deny plaintiff an individual permit for the fill of .41 acres of wetland and UPHOLDS the Corps' Restoration Order of October 24, 1992.

*Plaintiff's due process claim:*

■ Plaintiff's last argument is that the Corps denied plaintiff due process of law when it suspended plaintiff's nationwide permit, because the Corps did not provide plaintiff with notice and a hearing. The

court rejects plaintiff's argument outright. First of all, plaintiff mischaracterizes the Corps' actions. The Corps never suspended or revoked plaintiff's nationwide permit, for plaintiff never had one in the first place. The Corps simply decided to treat plaintiff's after-the-fact permit application as one for an individual permit as opposed to one for a nationwide permit.

Second, to the extent that plaintiff is arguing that he had a right to a trial-type hearing on the status of his permit application, plaintiff is simply wrong. No formal, adjudicatory hearing is required under section 404 of the Clean Water Act. 33 C.F.R. § 327.4; *AJA Associates v. Army Corps of Engineers*, 817 F.2d 1070, 1073–1074 (3rd Cir.1987); *Buttrey v. United States*, 690 F.2d 1170, 1178 (5th Cir.1982). 33 C.F.R. § 327.4 leaves it up to the discretion of the Corps to determine whether a public hearing will be necessary on any particular permit application. 33 C.F.R. § 327.4. The regulation leaves it up to the applicant or any other interested person to request an oral hearing, *id.*, and, here, plaintiff made no such request.

Moreover, the CWA does not give plaintiff a right to a hearing on whether his permit application should be treated as one for a nationwide permit or as one for an individual permit. 33 C.F.R. § 330.7, the regulation governing the procedures pursuant to which the Corps grants a nationwide permit, says nothing about a public hearing for the benefit of the applicant. In fact, § 330.7 states that a nationwide permit will not issue unless the permittee is notified by the Corps that the permittee can proceed or if twenty days have elapsed since the date of notification. 33 C.F.R. § 330.7(a)(1) and (3). Furthermore, § 330.7(a)(2) explicitly states that, without either notice or a hearing, the Corps can notify an applicant that an individual permit will be required, 33 C.F.R. § 330.7(a)(2).

Finally, plaintiff concedes that the Corps has discretionary authority under 33 C.F.R. § 330.8 to override a nationwide permit application and require an individual permit application in its place. Like § 330.7, § 330.8 does not give the applicant a right

to a hearing before the Corps decides to exercise that discretionary authority. The only time that notice and a hearing is required under § 330.8 is when, after the Corps has allowed a dredge-and-fill activity to proceed under a nationwide permit, the Corps decides to modify, suspend or revoke that nationwide permit. 33 C.F.R. § 330.-8(d). Here, the Corps never granted plaintiff a nationwide permit under either § 330.7(a)(1) or § 330.7(a)(3). Therefore, the Corps could not have modified, suspended or revoked anything, and no hearing was required when it required plaintiff to submit an application for an individual permit.

Finally, there is no question that, despite the absence of a formal hearing, the Corps honored plaintiff's constitutional right to due process throughout all stages of the administrative proceedings in this case. 'The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." ' *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976), (*quoting, Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). In line with this mandate, the Corps gave plaintiff ample opportunity to respond to and rebut any objections received by the Corps from the public with regard to plaintiff's permit application. *Cf. United States v. Alleyne*, 454 F.Supp. 1164, 1173 (S.D.N.Y.1978). At the time that the Corps was deciding whether to treat plaintiff's application as one for a nationwide or individual permit, the Corps notified interested state and federal agencies pursuant to 33 C.F.R. § 330.7(c) and then asked plaintiff for a response. Then, when the Corps decided to treat the application as one for an individual permit, the Corps notified the public, received objections and again allowed plaintiff to respond. In fact, when plaintiff failed to do so, the Corps stayed its Restoration Order to give plaintiff another opportunity to address the merits of his application.

Thus, plaintiff had more than enough of an opportunity to communicate to the Corps his arguments in support of his dredge-and-fill project, in all of its various forms, and the court rejects plaintiff's due process argument.

*Plaintiff's takings claim:*

■ Plaintiff claims that the Corps' denial of plaintiff's permit application constituted a taking within the meaning of the fifth amendment. Instead of compensation, though, plaintiff merely seeks equitable relief in the form of an injunction enjoining the Corps from enforcing its Restoration Order. The court now rejects plaintiff's claim for two reasons. First is the issue of whether the court even has jurisdiction to hear plaintiff's takings claim, given the fact that plaintiff seeks equitable as opposed to compensatory relief. On October 9, 1991, the court addressed this issue and ruled that plaintiff's takings claim was properly before the court. *See* Order, dated October 9, 1991, denying defendants' Partial Motion to Dismiss. The court, though, has reconsidered its prior ruling, and the court now HOLDS that plaintiff's takings claim is not properly before this court.

"Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016, 104 S.Ct. 2862, 2880, 81 L.Ed.2d 815 (1984). A suit for compensation against the United States is available in the United States Court of Claims under the Tucker Act, 28 U.S.C. § 1491, unless Congress explicitly states otherwise. *Id.* In other words, a property owner can sue for equitable relief under the fifth amendment only if the federal statute pursuant to which the alleged taking occurred specifically withdraws Tucker Act jurisdiction from the Court of Claims. *Id.* The CWA is the federal statute pursuant to which the Corps denied plaintiff's permit application and issued its Restoration Order. The CWA, though, says nothing about excluding jurisdiction from the Court of Claims over takings claims brought under it. Therefore, plaintiff can bring a suit for compensation in the Court of Claims under the CWA, and plaintiff's

fifth amendment claim rests within the exclusive jurisdiction of the Court of Claims. *Ruckelshaus,* 467 U.S. at 1016, 104 S.Ct. at 2879; *United States v. Fisher,* 864 F.2d 434, 439 (7th Cir.1988); *Century Federal Savings Bank v. United States,* 745 F.Supp. 1363, 1370 (N.D.Ill.1990). Consequently, this court lacks jurisdiction over the claim.

■ The second reason for why the court dismisses plaintiff's takings claim is that, even if the court had jurisdiction over it, the court finds that the action complained of did not constitute a taking. For a taking to have occurred, a property owner must demonstrate that the government effectively denied him or her economically viable use of his property. *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). In other words, an owner must show that the government went "too far," so that its excessive regulation of the owner's use of his or her land warrants compensation. *Pennsylvania Corp. v. Mahon,* 260 U.S. 393, 415–416, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922); *see also Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 125, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978).

That does not mean that the mere diminution in economic value of the owner's property will suffice. *Penn Central,* 438 U.S. at 131, 98 S.Ct. at 2663; *Deltona Corp. v. United States,* 228 Ct.Cl. 476, 657 F.2d 1184, 1191 (1981). Nor does a taking exist where the government denies the owner the ' "highest and best use," i.e., the most profitable use, that would be available in the absence of regulation.' *Florida Rock Industries, Inc. v. United States,* 791 F.2d 893, 901 (Fed.Cir.1986). A taking occurs when a consideration of fairness and justice dictates that the economic impact of the regulation on the owner and the owner's distinct investment backed expectations far outweigh any benefit to the public that the regulation is designed to promote. *Penn Central,* 438 U.S. at 123–124, 98 S.Ct. at 2659.

■ Based on the foregoing, the court finds that the Corps did not engage in a taking when it denied plaintiff's permit ap-

plication and issued its Restoration Order pursuant to section 404 of the CWA. The Corps' action did not deprive plaintiff of all economically viable uses of his property. Plaintiff still has indiscriminate use of the property upland from the wetlands; plaintiff just can't use any portion of the wetlands for the purpose of building his recreational facilities. In fact, plaintiff himself concedes that the Corps' actions did not destroy all viable uses of his property. Plaintiff simply claims that the Corps deprived him of "an" economically viable and reasonable use of his property, i.e., the use of a tennis court, situated so that one corner would have to be supported by .41 acres of wetland. Therefore, the court concludes that, in light of the important public purpose behind the CWA, the Corps did not excessively interfere with plaintiff's investment backed expectations, and, accordingly, the court finds that no taking occurred. *Accord, Deltona Corp.,* 657 F.2d at 1194; *Gil v. Inland Wetlands and Watercourses Agency of the Town of Greenwich,* 23 Conn.App. 379, 580 A.2d 539 (1990); *American Dredging Company v. State of New Jersey, Department of Environmental Protection,* 161 N.J.Super. 504, 391 A.2d 1265, 1271 (1978); *Sibson v. State,* 115 N.H. 124, 336 A.2d 239, 240 (1975).

*Conclusion:*

The court GRANTS defendants' Motion for Summary Judgment and DENIES plaintiff's Cross-motion for Summary Judgment. The court HOLDS that (1) the Corps acted reasonably when it considered plaintiff's permit application under the individual permit program of the CWA, as opposed to the Act's nationwide permit program, and (2) the Corps reasonably denied plaintiff's application for an individual 404 permit. Accordingly, the court AFFIRMS the Corps' decision to deny plaintiff's permit application, and the court UPHOLDS the Corps' Restoration Order, dated October 24, 1990.

Furthermore, the court DISMISSES both of plaintiff's constitutional challenges to the actions taken by the Corps with regard to plaintiff's land. Plaintiff's due process

claim is without merit. Plaintiff's fifth amendment claim is beyond this court's jurisdiction, and even if it were not, the court finds that no taking took place.

SO ORDERED.